[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Nature of Proceedings
On 10/19/94, nearly three years after being placed in foster care at the age of 18 months, Samuel G., Jr., born 5/17/90, (Sammy) became the subject of this petition by which the Department of Children and Families (DCF) seeks to terminate the parental rights of his parents, Samuel G. Sr. and Linda G., so that he may be freed for placement in a permanent home. Grounds alleged for such termination, as set forth in Sec. 17a-112
(b) of the Conn. Gen. Stats. (Rev. 1995) applicable to children such as Sammy who were previously committed to the state as neglected or uncared for pursuant to Sec. 46b-129, were CT Page 1267-MMM threefold:
 (1) "The child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child; [and]
 (2) the parent of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child; [and]
 (3) there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child."
At the initial hearing on 11/17/94, both parents, having been personally served, appeared with separate counsel and indicated their opposition to the state's position. The matter was continued to secure an evaluation by the same psychiatrist who had seen the family in March of 1992 following the child's initial removal from home. Evidence was offered in three trial days in July and August of 1995 and the parties given to 9/19/95 for the filing of trial memoranda.
Facts
Evidence offered at trial, interpreted in the light of the prior record in this court concerning this child, of which judicial notice is taken, supports the finding of the following factual chronology:
1. Prior to commitment (12/22/92)
Sammy was born in May of 1990, the same month his parents were married. This was the first marriage of his father, who CT Page 1267-NNN turned 50 years old the following month, and the third marriage of his mother who had had another son during her first marriage 13 years earlier, That child was no longer in her custody at the time of Sammy's birth. The mother, who had long been employed driving 18-wheel tractor-trailers across the country, had held a variety of other jobs and had been incarcerated for brief periods on a number of occasions. In September of 1991 Linda left the home following the first referral of this child to the Department of Children and Youth Services (the then counterpart to DCF) resulting from an episode of domestic violence involving the police. Sammy was not placed in foster care, however, until two months later following his father's arrest for risk of injury after twice leaving the child unattended — once in his parked car while he was in a nearby bar; once in a crib in the family apartment, alone but for a shotgun in the crib beside him, while his father returned to the bar. The circumstances that led to the child's commitment to DCF on 12/22/92, following an extensive trial necessitated by the father's persistent denial of any dereliction of parental responsibility, are set forth in detail in the court's memorandum of decision of that date (Mulcahy, J.) appended hereto as Appendix A. Linda, who was incarcerated at the time of the incidents, entered a nolo plea to the allegations of neglect. The same circumstances that resulted in the commitment of the child subsequently resulted in the conviction of Samuel Sr. for risk of injury, affirmed on appeal. State v. George,37 Conn. App. 388 (1995).
A psychiatric evaluation conducted by Dr. Richard Sadler prior to commitment had highlighted some of the family's problems that needed to be addressed before reunification could be considered: Linda's frequent absences from the child, due to her periodic incarcerations and employment requirements, and her chronic abuse of alcohol; the father's ". . . major emotional disorder which has affected his judgment and his thinking abilities". (State's Exh. A, p. 21.) Based upon these, the court spelled out its expectations for reunification. (Appendix A, p. 19-20.)
2. From commitment (12/22/92) to Adjudicatory Date (10/19/94)
Initially Samuel, Sr. was permitted to visit his son at the foster home, but his erratic and bizarre behavior during such visits resulted in DCF requiring all visitation to be supervised. Despite this change, the father continued to visit CT Page 1267-OOO regularly until Christmas of 1993 when, apparently angry because his request for an unsupervised Christmas visit had been denied, he left the office and did not return for subsequent visits for months. At trial he gave bad weather as the only reason for this abrupt cessation of visits. (Testimony of 8/18/95.) Snow was long gone by 5/10/94 when, at a court hearing on the first extension of the child's commitment, the father requested resumption of visits after ". . . my lawyer said you'd better ask for a visit." (Id.) He subsequently requested an administrative hearing which resulted in a recommendation for a clinical evaluation before visits could be resumed. This matter was still pending at the time the termination petition was filed.
During the 22 months between commitment and the adjudicatory date for this petition, Samuel Sr. pursued a variety of parenting and counselling programs. (Testimony of social worker Resnick, and Samuel Sr., 8/18/95, ) None seem to have improved his judgment with regard to his child's safety or to appropriate expectations of a child of Sammy's age and limitations. (Testimony of social worker Resnick, 7/28/95; testimony of social worker Sikora-Kowolik, 8/18/95; state's Exh. C, p. 12-13.) Evidence offered by the respondent father compels the conclusion that his past problems in caring appropriately for his son were not amenable to treatment. See respondent father's Exh. 1, a letter from his therapist at Catholic Family Services which concludes with the statement, "I believe that Mr. G. has tried to the best of his ability to comply with your demands but he is not able to become a different person."
During this same period, Linda continued her longstanding battle with alcohol which, by her own admission (testimony of 8/18/95) had not been successful until March of 1995, five months after the adjudicatory date. These attempts and their apparent lack of sustained success were corroborated by the DCF social worker. (Testimony of social worker Resnick, 7/28/95.) The mother's instability in employment and housing continued, by her own admission, beyond the adjudicatory date to the final day of trial. (Testimony of 8/18/95.) Although she had agreed in a pretrial conference of 8/3/92 to visit as often as DCYS would permit (State's Exh. G), she requested no visits at all for the first seven months of the child's commitment. Although given weekly visitation starting with her request in July of 1993, out of the first 52 possible weekly visits, Linda visited only 12 CT Page 1267-PPP times. (Testimony of social worker Resnick, 7/28/95.) Between August and December of 1994, despite institution of this termination action, Linda visited only three out of a permitted 21 visits.
(3) From adjudicatory date to dispositional date (8/18/95).
In the ten months between the adjudicatory date and the final day of trial (the dispositional date), Samuel Sr. pursued the reinstitution of his visiting rights. DCF agreed to abide by the recommendation of Dr. Sadler following his reevaluation of the family in January of 1995. (State's Exh. B.) At the conclusion of that report, Dr. Sadler did not explicitly proscribe all visitation but recommended "In my opinion, visitation between either of Sammy's parents and Sammy should never be unsupervised." (Id. p. 22.) In view of this, visitation with Samuel Sr. was reinstituted in April of 1995. Although the father brought gifts and spoke gently to the child, he appeared to the supervising social worker to be ". . .in some other place" (testimony of social worker Sikora-Kowolik, 8/18/95), evidencing behavior she characterized as "bizarre" and appearing unresponsive to the child. (Id.) To that social worker, "[The father] appeared to be hallucinating and hearing voices. He talked to himself in what appeared to be fragmented thoughts." (State's Exh. H, p. 2.) Following the third such visit, ". . Sammy started having serious emotional difficulties. His behavior deteriorated. He became violent, self-destructive and out of control at home as well as in school." (Id.) The child's adverse reactions were so marked that Dr. Michael Pines, the psychologist who had previously provided therapy for the child, became reinvolved and on 5/31/95 recommended that all contact with both parents be discontinued. (State's Exh. I.)
 Chronologically, it appears Sammy's behaviors have worsened since the re-institution of supervised visits with his father, Mr. G. . . He has been diagnosed with ADHD, reactive attachment problems, and explosive behaviors. I believe the visits have increased his uncertainty and fearfulness which in turn reduces his ability to exhibit self control. Furthermore, Sammy's mother, Linda, has not regularly exercised her agreed upon phone call and visitation schedule. She has not had any contact with Sam for several months. . . .Sam is aware that his mother is allowed contact and is perplexed as to why she had not followed through. In CT Page 1267-QQQ light of the mother's inconsistent contact with her son, and Sam's deteriorating behaviors following visits with Mr. G., I feel that continued contact of any kind between Sam and either of his birth parents is not in this child's best interest. In my opinion, direct contact or the promise of contact has only served to increase this child's anxiety, fearfulness, and general worries and resulted in more problematic behaviors . . . The deterioration in behavior seems to be related more to re-institution of paternal visits and the erratic maternal contact than to medication management issues.
Linda's erratic pattern of visitation persisted despite pendency of this termination proceeding. In the first two months of 1995, out of eight possible weekly visits she came for only two, arriving each time evidencing signs of intoxication (Smelling of alcohol; trouble coordinating movements.) Both visits consequently were cancelled. From March to May of 1995, out of 12 potential visits, Linda cancelled two and failed to appear for three more. (State's Exh. H, p. 1.) In February of 1995 she was evicted from her last known address, her whereabouts becoming unknown until commencement of trial.
(4) Clinical recommendations
The recommendation of Dr. Pines against visitation is consistent with the views expressed by Dr. Sadler who had seen the family twice, in March of 1992 (State's exh. A) and January of 1995 (State's Exh. B). After seeing the parents and child individually and in separate interactions, he reached the following conclusions:
 Diagnostically I would continue to diagnose Mr. G. as having a Schizotypal Personality Disorder. [He] is found by me not to have made progress with his own emotional or interpersonal functioning, nor has he made progress in his understanding of his son's developmental needs or his own parenting duties. Mr. G. remains the same person as interviewed two years ago, and he has shown no substantial gains in his parenting abilities over the three years that his son has remained in foster care. (State's Exh. B, p. 11.)
CT Page 1267-RRR
 . . . Mrs. G. presents herself in an essentially unchanged fashion from my previous interview of two years ago. Mrs. G. has continued to have documented drinking episodes. . . . [She] appears to have no conception regarding her son's needs . . . has failed to visit her son on a regular basis during his three years of foster care . . . has not conducted herself in a manner which is consistent with providing a minimally adequate parenting environment for her son . . . has failed to address the pertinent issues that have interfered with her ability to care for her son over the past three years . . . [and] does not provide objective information to support that there has been any change in her behavior. (Id. p. 17.)
After a detailed analysis of each participant, Dr. Sadler concluded that "In my opinion, neither parent is currently capable of offering minimally adequate parenting for their son. Over the past three years, neither parent has demonstrated any gains in functional ability which would encourage my belief or hope that they would be able to make sufficient progress within a time frame that would be developmentally tolerable to their son in order to minimally adequately parent their child. In my opinion, neither parent will be able to offer minimally adequate parenting to their child in the future." (Id. p. 22.)
In his testimony of 7/21/95, Dr. Sadler clarified that both parents fully understood the nature of the proceeding and were capable of assisting their respective attorneys in their defense. Since he had found "no substantial change in understandings or abilities" in either parent between March of 1992 and January of 1995, he did not find that the lapse of six months since the latest evaluation would make any difference in his conclusions. He found it "astounding" that Linda never acknowledged any difficulties in parenting while the father's" . . . very unusual" understanding of the world led to errors of judgment that resulted in the child's original commitment as well as to his father's criminal conviction. Nonetheless, Samuel Sr. never acknowledged any error in judgment or evidenced any ability to modify his behavior sufficiently to care adequately for this child. His attendance at parenting education and counselling sessions resulted in no apparent increased understanding of himself or ability to function as a CT Page 1267-SSS parent.
Dr. Sadler's diagnosis of schizotypal personality disorder is not, in his opinion, a "commonplace" one. It permits an odd but stable style of functioning that requires no treatment, even if the patient would accept treatment. Although the father always wanted to do his best for his son, he failed to appreciate the consequences of his errors in judgment, showing no better understanding of this in 1995 than he did in 1992.
According to Dr. Sadler, all children need permanency of placement by the time they are the age of this child (five), but Sammy needs it more than most, given his emotional and neurological problems. Neither parent is capable of caring for a normal child and their son's specialized needs necessitate care by especially capable parents with the capacity not only to understand those special needs but also to work with a variety of helping systems (medical, educational). Neither parent demonstrated such capacity either in 1992 or in 1995.
Adjudication, on facts as of 10/24/94
1. Abandonment.
Father: While Samuel Sr. gave no valid excuse for his failure to visit his son, or to maintain any other kind of contact with him, for a period of nearly five months (December of 1993 to May of 1994), the ensuing hiatus of nearly eleven more months before the first of the three permitted visits in 1995 took place was not of his doing. His request to recommence visits, first made in court in May of 1994, was deferred first for an administrative review, and then for a psychiatric evaluation that was not conducted until January of 1995. After three visits, all further visits were suspended on 5/31/95 on the recommendation of the child's therapist after Sammy's difficulties at home and in school increased following resumption of his father's visits. Except for those five months in 1994, Samuel Sr. has either visited regularly or has been denied requested visitation because of the clinical needs of his son. This does not fit within the definition of abandonment found in Sec. 17a-112.
Mother: Linda was never denied visitation. After having failed to seek any visits for the first six months of the child's commitment, upon her first request for a visitation CT Page 1267-TTT schedule in July of 1993 she was given the right to visit weekly. of the more than 100 possible visits she could have had in the two years that ensued, she kept only a small portion and a number of visits that she did attempt were aborted because her behavior was consistent with the continued abuse of alcohol. While her interactions with her son were appropriate on those sober visits that did take place, the degree of "interest, concern or responsibility" she has displayed toward Sammy throughout the nearly four years of his foster placement does not rise to the level of a "reasonable degree of interest, concern or responsibility" as to the welfare of this child.
Abandonment is therefore found, by clear and convincing evidence, to be a ground for terminating the parental rights of Linda G. but must be dismissed as to the father, Samuel G.
2. Failure to rehabilitate.
The petitioner has presented more than enough evidence to support by clear and convincing proof the conclusion that both parents have "failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child
[emphasis added] such parent could assume a responsible position in the life of the child."
Father: Two months after assuming sole care of Sammy, Samuel Sr. left the child unattended in a car at the age of 18 months while he frequented a nearby bar. Warned by a police officer not to leave such a young child unattended, he took the child home, only to leave him alone in his crib where the father had stored his shotgun and returned to the bar. Arrested for risk of injury, he denied any responsibility and took an unsuccessful appeal from his ensuing criminal conviction. His lack of judgment as to the needs of a young child have not been tempered by the counselling secured during the four years since this occurrence. No expert witness was called to refute the strong opinion voiced by Dr. Sadler that Samuel Sr. is not now, and for the foreseeable future will not become, able to care adequately for this child. The fact that this man's thinking, affect and conduct are dictated by a clinically designated condition that is not amendable to treatment cannot be permitted to outweigh his child's unquestioned need for permanent caretaking by competent caretakers. Termination of Samuel's parental rights is not intended by the applicable statute to be a punishment for CT Page 1267-UUU the parent; it is designed to permit a child whose care by biological parents has fallen below acceptable community standards to secure an adequate permanent home after his parents have been given a reasonable period of time to demonstrate a sufficient improvement in parenting ability to permit the child's safe return. It is immaterial whether the failure to demonstrate such improvement is due to unwillingness or inability; the impact on the child is the same.
Mother: The petitioner's evidence supporting this ground to terminate Linda's parental rights is even stronger. When Sammy was originally placed, he had been out of his mother's care for only two months. Since then, nearly four years have passed and by her own admission under oath on 8/18/95, Linda was still not ready to resume his care. Her well established pattern of alcohol abuse, interspersed by finite periods of treatment and sobriety, of homelessness, of shifting relationships and intermittent incarcerations has only become more marked in the four years since she relinquished Sammy's care. In August of 1992 she entered a nolo plea to the original petition alleging Sammy to be neglected and uncared for; in August of 1995 she testified that she was still unable to make a home for him. Whether this inability stems from forces within or beyond her power to change is immaterial; the impact on the child is the same. This parent, who acknowledged her inability to care for Sammy when he was 18 months old, continues to acknowledge the same inability four years later. Considering Sammy's special needs, she has clearly "failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, [she]. . .could assume a responsible position in the life of the child." Her continued failure to visit him regularly, even during the pendency of this termination proceeding, only confirms this conclusion.
It is therefore found by clear and convincing proof that both respondent parents have failed to rehabilitate, within the meaning of this statutory ground for termination of parental rights.
3. Absence of parent-child relationship.
Application of the clear language of Sec. 17a-112 (b)(4) to Sammy's situation would seem to support a finding, by the requisite clear and convincing proof, that this ground exists CT Page 1267-VVV with regard to both parents. Whatever relationship may presently exist between Sammy and each parent, it is not one that can be described as a "parent child relationship" as described in the statute. The lack of such relationship, however, has never alone been grounds for termination of parental rights. From the inception of this ground in 1975, the absence of a parent-child relationship was only the factual predicate for the ground itself, viz: ". . .to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." In this case, the lack of improvement in both parents' capacity to care adequately for Sammy over nearly four years, the unlikelihood of sufficient change taking place in the foreseeable future, and the child's need for permanency after spending four of his five and one-half years of life as a foster child compels the conclusion that Sammy can wait no longer for the reestablishment of whatever parent-child relationship may have existed four years earlier.
The interpretation of this statute by the appellate courts of this state, however, no longer permits application of what appears to be its clear language. The appellate courts apparently regard the absence of a parent-child relationship not as a factual predicate for the actual ground for termination (e.g. the negative impact on the child of waiting any longer for a possible reunion with parents) but as the ground for termination itself. Because a parent-child relationship can be attenuated or lost through custody orders unrelated to the parent's ability to provide adequate care (such as following divorce; separation necessitated by illness or incarceration), this ground can no longer apply except in cases where the parent has become a total stranger to the child, such as in abandonment situations, or where the child's reaction to the parent is wholly negative. In re Jessica M., 217 Conn. 459 (1991) ; In ReValerie D., 234 Conn. 492 (1992); In re Kelly S., 29 Conn. App. 600
(1992). In this case, Sammy clearly knows that Linda and Samuel Sr. are his mother and father, although he may be confused since they are not the parents who have cared for him since he was 18 months old. The child is not averse to visiting with his parents and interacted with them at least as well as he did with other familiar adults.
Interpreting this ground as required by appellate court decisions, it must be dismissed as to both parents. CT Page 1267-WWW
Disposition on facts as of 8/18/95
Between the adjudicatory date and the dispositional date ten months later, little had changed with regard to the parents' individual abilities to care for this child. Linda continues her erratic life, punctuated by periods of sobriety and incarceration, without a permanent home of her own and without any clearly demonstrated desire to spend time with her son. Samuel Sr. continues his unusual behaviors, evident to the court during the trial as they had been to Dr. Sadler and to the social workers and foster mother who testified. His psychiatric condition is not amenable to treatment or likely to change in the foreseeable future and precludes his being able to exercise appropriate judgment or to work effectively with community services that will be required to meet the child's future educational and psychological needs.
What has changed during this ten month period is the clarification of Sammy's special needs and the negative effect upon him of continued contacts with either parent. Both parents had been appropriately concerned about Sammy being given "drugs" (Ritalin) by Dr. Pines. Such medication had to be doubled when visits with his father were resumed but were able to be decreased when these visits were stopped on the recommendation of the child's therapist. Those special needs make it imperative that Sammy be permitted to be placed permanently with an adoptive family as soon as possible, thus ending the uncertainty of caretaking that he has known since he was a toddler.
Before an order or termination may enter, however, the court must consider carefully the seven factors set forth in Subsection (d) of Sec. 17a-112:
1. DCF recommended agencies where both parents could obtain the counselling help suggested by Dr. Sadler's first evaluation. Linda pursued a number of alcohol treatment programs but continued to abuse alcohol as recently as March of 1995, by her own admission. She has been unable to sustain any period of sobriety long enough to suggest it might be maintained indefinitely. Samuel Sr. sought counselling help at Catholic Family Services which discontinued when it could effect no change in those aspects of his behavior which would impact on his ability to care for a child. He also attended a number of CT Page 1267-XXX other parenting-oriented programs, none of which effected any discernible change in his ability to exercise mature judgment in matters concerning the care of this particular child. The testimony of Dr. Sadler compels the conclusion that the psychological problem that led to his inability to care for his son in 1991 continue unabated into 1995 and will continue for the foreseeable future. No fault can be ascribed to the father's inability to meet this child's needs, but the absence of fault in parents should have no relevance in determining a child's best interests.
2. DCF made reasonable efforts to reunite Sammy with his parents. It encouraged visits, only suspending them when recommended by qualified clinicians familiar with the child. It facilitated such visits by changing locale, where appropriate, providing bus passes, permitting telephone calls between visits. It provided references to appropriate treatment centers and invited the parents to treatment plan reviews to discuss Sammy's future at semi-annual intervals.
3. The court issued no orders, other than to attend court and court-ordered evaluations, with both of which these parents complied. Expectations articulated at the time Sammy was committed were largely carried out by the father, except the abrupt cessation of all visitation in December of 1993 until his attorney suggested that he request resumption of visitation at his next appearance in court five months later. Linda was unable to adhere to most of these expectations, from sustaining treatment for substance abuse and sobriety to regular visiting, securing of adequate housing, and keeping DCF apprised at all times of her whereabouts.
4. Dr. Sadler specifically addressed the emotional ties Sammy presently has for his parents:
 Sam continues to have an emotional relationship with his parents, although the nature of the relationship is not a parent-child relationship. . . . He shows a superficial relationship with both of his parents . . . (State's Exh. B, p. 20.)
Dr. Sadler was not asked to evaluate the relationship between Sammy and the foster parents with whom he has lived for more than two thirds of his life. Since they are not prospective adoptive parents this omission is not of critical importance. CT Page 1267-YYY 5. Sammy was 51 months old on the dispositional date. He was cared for by both parents for only his first 16 months, when his mother left the home, leaving the father as his sole caretaker. His father acted as such for only two months before being arrested, and ultimately convicted, for risk of injury following a remarkable exercise of poor judgment, notwithstanding a timely warning by a police officer as to the possible consequences of such poor judgment. For the next 45 months Sammy has been a state ward, cared for by competent foster parents who are not committed to his permanent care. The child's therapist has found continuing contact with his parents detrimental to his well-being; the court-appointed psychiatrist concluded that ". . . neither parent will be able to offer minimally adequate parenting to their child in the future." (Id., p. 22.) The child has already waited too long in the uncertainty of the foster care world. His turn has come. He needs a permanent home without further delay.
6. Both parents have made some efforts to adjust their circumstances, conduct or conditions to make it possible for Sammy to return home. Linda has engaged in sporadic drug treatment, and at the time of giving her testimony declared she had been sober then for five months. But she had no home, no fixed source of income, and, most important, no demonstrated motivation to resume care of her son. Samuel Sr. engaged in a variety of helping services, but offered no evidence that any of them had had any enduring impact on his ability to parent. Dr. Sadler, who had seen him in March of 1992 and again in January of 1995 found no such impact, concluding:
 Over the past three years, neither parent has demonstrated any gains in functional ability which would encourage my belief or hope that they would be able to make sufficient progress within a time frame that would be developmentally tolerable to their son . . . neither parent will be able to offer minimally adequate parenting to their child in the future.
7. Neither parent has been prevented from maintaining a meaningful relationship with their child by any act or conduct of the other parent. While DCF delayed resumption of the father's visitation after the abrupt cessation of all contact for a five month period, it was because of concern for the impact of such resumption on this special needs child. When visits were resumed, the negative impact on the child led to his CT Page 1267-ZZZ therapist's clear recommendation for the cessation of all contact with both parents. Adhering to such recommendation, while certainly not promotive of any meaningful parent-child relationship, cannot be said to be unreasonable considering the unlikelihood of reunification and the clearly damaging impact of continued visits on the child.
Judgment
Having duly considered the foregoing facts, it is found by clear and convincing evidence to be in the child's best interests for the parental rights of both parents to be terminated so that he may be placed, after spending four of his five and a half years as a state ward, in the security of a permanent home.
Therefore, it is Ordered that the parental rights of Samuel G. and Linda G. in and to their son Samuel G., Jr. be terminated
and that the Commissioner of Children and Families be appointed statutory parent for the purpose of placing this child in a permanent home. To secure this end, and in conformity with subsection (i) of Sec. 17a-112, it is further Ordered that the said Commissioner shall report to the court in writing no later than 90 days after the date of this judgment as to the progress in implementing such plan. If adoption of this child has not been finalized within one year of the date of this judgment, the said Commissioner is further Ordered to submit a Motion for Review of Plan for a Terminated Child to be heard no later than fifteen months after the date of this judgment.
Entered at Hartford this 11th day of January, 1996.
FREDERICA S. BRENNEMAN, JUDGE