IN RE KELLY S.*
(10979)

DUPONT, C. J., LAVERY and FREEDMAN, Js.

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 4166B.2, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued September 23—decision released December 1, 1992

*Maureen A. Chmielecki* and *Mark Shapera,* for the appellant (respondent mother).

*Michael McKenna,* assistant attorney general, with whom, on the brief, was *Richard Blumenthal,* attorney general, for the appellee (petitioner).

FREEDMAN, J. This appeal involves coterminous petitions for custody and for termination of parental rights filed by the commissioner of children and youth ser-

vices (commissioner or DCYS). The respondent mother[1] appeals from the judgment of the trial court adjudicating Kelly S. to be a neglected and uncared for child under General Statutes § 46b-129 and terminating the respondent's parental rights pursuant to General Statutes § 45a-717.[2] On appeal, the respondent argues that

---

[1] The father of the infant has not appealed from the judgment of the trial court terminating his parental rights with respect to the infant involved. We will refer in this opinion to the respondent mother as the respondent.

[2] General Statutes § 17a-112 governs the termination of parental rights regarding a child previously committed to the custody of the commissioner of children and youth services. In this case, however, there were coterminous petitions for such a commitment and for termination of parental rights, a procedure authorized by § 17a-112 (e). Under that procedure, the court in terminating parental rights does so pursuant to General Statutes § 45a-717. Although the petitioner in her pleadings relied on General Statutes § 17-43a, the statutory predecessor to § 17a-112, and the trial court relied on § 17a-112, the provisions governing termination of such rights under both statutes are identical with respect to the grounds relied on by the commissioner and sustained by the trial court. The provisions of General Statutes § 45a-717 pertinent to this appeal are as follows: "(f) At the adjourned hearing or at the initial hearing where no investigation and report has been requested, the court may approve the petition terminating the parental rights and may appoint a guardian of the person of the child, or if the petitioner requests, the court may appoint a statutory parent, if it finds, upon clear and convincing evidence that the termination is in the best interest of the child and that . . . with respect to any nonconsenting parent, over an extended period of time which, except as provided in subsection (g) of this section, shall not be less than one year: (1) The child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child; or (2) the child has been denied, by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for his physical, educational, moral or emotional well-being. Nonaccidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights; or (3) there is no ongoing parent child relationship which is defined as the relationship that ordinarily develops as a result of a parent having met on a continuing, day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of the parent child relationship would be detrimental to the best interests of the child. If the court denies a petition for consent termination of

the trial court improperly (1) permitted the introduction of certain hearsay evidence, (2) concluded that Kelly S. was neglected and uncared for under General Statutes § 46b-129, (3) concluded that there were parental acts of commission or omission that denied the child the care, guidance or control necessary for her physical, educational or moral well-being under General Statutes § 45a-717 (f) (2), (4) concluded that there was no ongoing parent-child relationship pursuant to § 45a-717 (f) (3), and (5) concluded that DCYS had met its statutory duty to provide reunification services. We affirm the trial court's judgment to the extent that it granted custody of the child to DCYS pursuant to § 46b-129, but reverse the judgment as to the termination of respondent's parental rights pursuant to § 45a-717.

Kelly S. was born on November 5, 1990. On November 8, 1990, while Kelly was still in the hospital, an order of temporary custody was granted by the trial court, *Potter, J.*, on the ground that she was in immediate physical danger from her surroundings and that immediate removal from such surroundings was necessary to ensure her safety. Simultaneously with the order of temporary custody, coterminous petitions were served on the respondent. The petitions, as amended on October 17, 1991, alleged that Kelly is neglected and uncared for, and sought to terminate the parental rights of the respondent on the ground of parental acts of commission or omission and on the ground of no ongoing parent-child relationship.

parental rights, it may refer the matter to an agency to assess the needs of the child, the care the child is receiving, and the plan of the parent for the child.

"(g) The court may waive the requirement that one year expire prior to the termination of parental rights if it finds from the totality of the circumstances surrounding the child that such a waiver is necessary to promote the best interest of the child."

After hearing testimony from numerous witnesses, the trial court, *Teller, J.,* found the following facts. The respondent mother, Lynn, is thirty-six years old and has a long history of mental illness, including psychiatric hospital admissions. She has a psychotic disorder, which has manifested itself with two distinct personalities, "Lynn I" and "Lynn II." Lynn I carries on an internal conversation with Lynn II. The respondent has demonstrated poor hygiene and urinary incontinence and has shown angry, aggressive behavior. She has hallucinated, and was unable to participate meaningfully in prenatal visits because of distractions relating to the hallucinations, which were, most likely, interactions with her other personality. She demonstrated no initiative or motivation to attend prenatal visits and would do so only when transportation was provided. She failed to attend postnatal visits. The respondent has denied that she had any mental illness or emotional disorder. In addition to Kelly, the respondent has given birth to three other children, one fathered by Kelly's father. All three were taken from her at birth by the New Hampshire equivalent to DCYS and placed in foster care because that agency felt she could not appropriately care for them. Termination proceedings in New Hampshire were completed as to the two older children and were pending as to the third at the time of the hearing in this case.

At the time the petitions were served, the respondent was living in a shelter for the homeless. At the time of trial, she resided with Kelly's father and two pets in a single room in the town of Rogers. That room had no cooking facilities and the residents use a common bathroom in the hall, which is not suitable for a child. Neither parent is employed, and both receive public assistance.

Kelly is a child with special needs. At the time of the hearing, she was developmentally delayed by at least

six months. According to her pediatrician, Kelly is a high risk baby with special needs and is demanding. Rearing a child in this condition would be taxing for a parent with ordinary abilities, as her medication and feedings require strict regulation. Caring for her requires constant diligence and vigilance. She has a gastroesophageal reflux condition that could cause food to be regurgitated into her lungs. This condition could be life threatening. Kelly must be held and positioned in a special way; she will not tolerate lying on her stomach or on her back for long. The "birth-to-three" program performed a developmental evaluation of Kelly when she was three months old at the request of Kelly's foster mother. Nancy Canata, the birth-to-three social worker, found that Kelly had developmental delays in visual tracking, language and motor development, and she recommended early intervention services. These services were arranged for and provided so that Kelly is seen by a visiting nurse and a speech-occupational therapist on a regular basis. These professionals have instructed the foster mother on the therapies she performs on Kelly. According to the foster mother, who has been a foster mother for ten years, she has three to four people in her home every week who help her with Kelly, including a department of mental retardation aide, an occupational therapist, a visiting nurse and a speech therapist. The therapists and foster mother try to teach Kelly to grasp and squeeze toys, roll over, track things visually and the like. Kelly needs full-time care, including therapy, medication, slow feedings of thirty to thirty-five minutes, sphincter muscle stimulation and other care beyond that required by a "normal" baby. It is reasonably likely that she will require such care in the future. The court found it significant that with all of this intervention and therapy and with round-the-clock care of a loving foster mother whose family helps care for the child, Kelly remains substantially developmentally delayed.

The court further found that the respondent was barely able to care for herself. She did not have a secure, stable, adequate home in which the child could reside. She did not exercise appropriate judgment and was no better able to deal with her ongoing psychiatric difficulties at the time of trial than she had in the past. According to the psychologist who performed a court ordered evaluation of the respondent, the respondent's impairments, which go back to at least 1975, greatly affect her ability to parent, rendering her unable to do so. He testified that the child would be placed at emotional risk and risk of physical harm if she were in the respondent's care. He opined that even with intensive therapy and treatment there is no reasonable likelihood that the respondent could ever be an adequate parent. Even if she were placed in a supervised residential setting with the child, the respondent would be unable to parent a child effectively.

In its memorandum of decision, the trial court observed that there was "no evidence that Kelly has been *actually* neglected or uncared for by her parents" since she had never been in their custody. (Emphasis in original.) On the basis of its findings of fact, however, the court concluded that the respondent's parental deficiencies, if Kelly were in her care, would have permitted the child to live under conditions, circumstances or associations injurious to her well-being and would have denied her proper care and attention physically, educationally, emotionally or morally. The court also found that the respondent's instability and inability to parent rendered Kelly homeless. The court further found that, although the respondent had obtained housing at the time of trial, it was totally inadequate, in light of the parents' deficiencies, to be viewed as a home for the child. Additionally, the court found that the respondent's home could not provide the specialized care that Kelly's physical, emotional or medical

condition requires. Accordingly, the court adjudicated Kelly to be a neglected and uncared for child pursuant to § 46b-129.

With respect to the termination petition, the court found the following additional facts. The respondent visited the child regularly between December 17, 1990, and October 17, 1991. The twenty-six, one hour visits were supervised by DCYS. During the visitation sessions, however, the respondent expressed no real depth of understanding of the needs of the child or her condition. The respondent did not question the foster mother or the DCYS worker about the child's care, requirements or her medical condition. The respondent did not ask to feed, diaper or even hold the child. Indeed, on several occasions when she was instructed to hold the child in a special way, she promptly forgot or ignored these instructions. The visits were treated by both parents in large part as social occasions. In one instance, when DCYS had prepared a twelve minute video tape featuring the therapies required to be performed with the child, the parents lost interest after a few minutes and began conversing with each other about other matters. This was so even though a DCYS worker discussed with both parents the importance of looking at the video and concentrating on it. The respondent talked during the video about other things, and frequently looked elsewhere than at the screen.

These visits did not permit the child to develop any recognition of her parents. The child did not react to them when they arrived or when they left. The child appeared to have "bonded" to her foster mother, to whom she looks and on whom she relies for all of her needs.

Susan Kristoff, a DCYS intake social worker, investigated a referral concerning a different family with whom the respondent was residing in October, 1991.

This family had young children, and the respondent was alleged to have attempted to suffocate one of the children. Kristoff testified that when asked about this allegation, the respondent replied, "I didn't try to kill the kid, just suffocate it."

On the basis of these findings, the trial court first addressed termination of parental rights under § 45a-717 (f) (2), which requires proof that the child has been denied, by reason of parental acts of commission or omission, the care, guidance or control necessary for her physical, educational, moral or emotional well-being. The court concluded that, by clear and convincing evidence, the commissioner had shown that the respondent is neither aware of nor able to provide for even the most basic needs of the child and that she will not be able to provide for such needs in the foreseeable future. The court expressly recognized that mental illness is not a ground for termination of parental rights but concluded that when mental impairments have an impact on a person's ability to function as a parent, that impact can be the basis for terminating parental rights. Accordingly, the court concluded that the evidence clearly and convincingly proved that acts of parental commission and omission demonstrative of an inability to care for her children were "reasonably certain to occur" and that these parental acts or deficiencies supported the conclusion that the respondent could not, in the best interests of the child, be permitted to exercise her parental rights and duties.

The trial court next considered termination of parental rights under § 45a-717 (f) (3), which requires proof of the lack of an ongoing parent-child relationship. The court concluded that no ongoing parent-child relationship existed between the respondent and Kelly. The court concluded that no such relationship could exist in light of the order of temporary custody and the filing of coterminous petitions three days after Kelly's

birth. The court observed that "while the mother obviously cares for and loves the child, there was no opportunity for the child to bond to her mother." The court also concluded that the petitioner had demonstrated by clear and convincing evidence that to allow more time to establish such a relationship would be detrimental to the best interests of the child.

The court further found, by clear and convincing evidence, from the totality of the circumstances surrounding the child that a waiver of the one year requirement pursuant to § 45a-717 (g) was necessary. In this regard, the court found "that by reason of their impairments, the parents are unable to provide even basic care for this specially needy child. The evidence is also clear and convincing that this condition had existed for a long time since Kelly's birth, and existed at the time of trial, and is not likely to improve within the foreseeable future. . . . [W]aiting for the statutory period to go by will not be in the child's best interests or change the situation. At the same time, however, the need to obtain a stable, permanent home for the child at as early an age as possible is compelling. There is therefore no reason to delay termination which is inevitable under these facts as the court perceives them."

I

The respondent's first claim is that the trial court improperly admitted into evidence certain medical and psychiatric records of Concord Hospital, a New Hampshire facility, which were contained in the records of Day Kimball Hospital.[3] These New Hampshire records were obtained by Day Kimball Hospital either directly

---

[3] The respondent also claims that the trial court improperly admitted evidence of the New Hampshire termination proceedings involving the respondent's other children. This claim, however, has not been properly presented for our review. Practice Book § 4065 (d) (3); *In re Robert K.*, 12 Conn. App. 585, 591–92, 532 A.2d 1319 (1987).

from Concord Hospital or from the Connecticut department of mental retardation, pursuant to releases signed by the respondent. The respondent argues that an inadequate foundation was laid for the admissibility of these documents created in New Hampshire. We disagree.

The trial court concluded, and the respondent does not dispute, that the records of Day Kimball Hospital qualify as business records under General Statutes § 52-180 (a).[4] Yet, "not every statement contained in a document qualifying as a business record is necessarily admissible. To be admissible under § 52-180, the contents of a business record must be based on the entrant's own observations or on information transmitted to him by an observer whose business duty it was to transmit it to him. Statements obtained from volunteers are not admissible, although included in a business record, because it is the duty to report in a business context that provides the reliability to justify this hearsay exception." *Raino* v. *Supermarkets General Corporation,* 28 Conn. App. 56, 60, 609 A.2d 1047, cert. denied, 223 Conn. 924, 614 A.2d 825 (1992). The trial court found the necessary business duty to exist under the circumstances of this case. We agree with the trial court that medical and psychiatric information provided to and relied on by a health provider that comes from a coordinate health or human service agency is information provided by one with a sufficient business duty to the ultimate health provider to allow the admission

[4] General Statutes § 52-180 (a) provides: "Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record any act, transaction, occurrence or event, shall be admissible as evidence of the act, transaction, occurrence or event, if the trial judge finds that it was made in the regular course of any business, and that it was the regular course of the business to make the writing or record at the time of the act, transaction, occurrence or event or within a reasonable time thereafter."

of the information into evidence despite its hearsay nature if it (1) is contained in the properly admitted business records of the ultimate health provider; compare *Orzechowski* v. *Higgins,* 146 Conn. 463, 466, 152 A.2d 510 (1959) (hospital record taken from doctor's file not admissible as business record of doctor); and (2) was related to the diagnosis or treatment provided by the ultimate health care provider to the patient. See *Perry* v. *Hospital of St. Raphael,* 17 Conn. App. 121, 125–26, 550 A.2d 645 (1988) (record of prior hospitalization included in records of different hospital during second hospitalization admissible as part of business record of second hospital); *Crest Plumbing & Heating Co.* v. *DiLoreto,* 12 Conn. App. 468, 472–76, 531 A.2d 177 (1987); *Shuchman* v. *State Employees Retirement Commission,* 1 Conn. App. 454, 458, 472 A.2d 1290 (1984). Here, it is not the mere receipt of documents in the ordinary course of business that permits their admissibility. *River Dock & Pile, Inc.* v. *O & G Industries, Inc.,* 219 Conn. 787, 801, 595 A.2d 839 (1991). Rather, the challenged documents were part of Day Kimball Hospital's records *and* were relied on by the hospital in its treatment of the respondent.

In addition, we note that in this case not only were the challenged documents relied on by Day Kimball Hospital in its treatment of the respondent, but they were also provided to Day Kimball Hospital pursuant to a written authorization signed by the respondent. The trial court concluded, and we agree, that this fact further enhances their reliability. The reliability and trustworthiness of an out-of-court statement offered to establish the truth of the matters contained therein is a primary concern of any exception to the hearsay rule. See *State* v. *Oquendo,* 223 Conn. 635, 664–69, 613 A.2d 1300 (1992); *Raino* v. *Supermarkets General Corporation,* supra, 63–64.

Accordingly, we conclude that the trial court did not abuse its discretion in admitting and relying on the New Hampshire medical and psychiatric information contained in the records of Day Kimball Hospital.

## II

The respondent's second claim is that the trial court improperly concluded that Kelly S. was neglected and uncared for because the court rested its determination on probabilities, rather than actual incidents of abuse or neglect.[5] We disagree.

A child may be committed to the custody of the commissioner upon a finding that the child is uncared for, neglected or dependent. General Statutes § 46b-129. "[A] child or youth may be found 'neglected' who (i) has been abandoned or (ii) is being denied proper care and attention, physically, educationally, emotionally or morally or (iii) is being permitted to live under conditions, circumstances or associations injurious to his well-being, or (iv) has been abused . . . ." General Statutes § 46b-120. "[A] child or youth may be found 'uncared for' who is homeless or whose home cannot provide the specialized care which his physical, emotional or mental condition requires." General Statutes § 46b-120. We review only the claim that the court improperly concluded that Kelly was "uncared for" under the "specialized care" section of the statute, since our decision that the court was

---

[5] The respondent frames much of her argument in terms of "whether a court may adjudicate a child as neglected or uncared for *and terminate parental rights* based on what might be." (Emphasis added.) The trial court, however, did not terminate the respondent's parental rights on the basis of the finding of neglect or of being uncared for. We nonetheless review her claim in the context of the trial court's decision to commit the child to the custody of the commissioner under General Statutes § 46b-129 both because she challenges the finding that supports that commitment and because that commitment is a statutory prerequisite to any petition for termination of parental rights pursuant to General Statutes § 17a-112, especially § 17a-112 (b) (2), which may be filed after our disposition of this appeal.

correct in this finding alone is sufficient to sustain the court's custody determination under General Statutes §§ 46b-120 and 46b-129. *In re Carl O.,* 10 Conn. App. 428, 435, 523 A.2d 1339, cert. denied, 204 Conn. 802, 525 A.2d 964 (1987).

There is no dispute that Kelly has specialized needs necessitated by her physical condition. The trial court found that the respondent was not capable of providing the necessary care. The evidence fully supports that conclusion. See id., 436. Actual incidents of abuse or neglect are not required in determining that a child is uncared for under the "specialized needs" section of the statute. Id., 435–36. For purposes of commitment of a child to the custody of the commissioner pursuant to § 46b-129, proof of ongoing parenting deficiencies is sufficient to satisfy the statute where those deficiencies mean that the child's home is unable to provide the care required for her special needs. Id.

### III

The respondent next challenges the two grounds on which the trial court based its termination of parental rights. In order to prevail, the respondent must successfully challenge both bases of the judgment terminating her parental rights. If either ground relied on by the trial court is upheld on appeal, the termination of parental rights must stand. *In re Juvenile Appeal (84-BC),* 194 Conn. 252, 258, 479 A.2d 1204 (1984). We conclude, however, that because neither ground supporting that determination can be sustained, the termination of the respondent's parental rights must be reversed.

### A

The respondent claims that General Statutes § 45a-717 (f) (2) cannot provide the basis for the termination of parental rights in this case because there

was no evidence of parental acts or omissions that denied Kelly the care necessary to her well-being. We agree.

The trial court found that "the evidence clearly and convincingly proves that acts of commission or omission are *reasonably certain to occur* . . . ." (Emphasis added.) Section 45a-717 (f) (2), however, authorizes the termination of parental rights where "the child *has been denied*, by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for his [or her] physical, educational, moral or emotional well-being. . . ." (Emphasis added.) This provision authorizes the termination of parental rights where specific acts of parental commission or omission have caused serious physical or emotional injury to the child. See *In re Theresa S.,* 196 Conn. 18, 25–27, 491 A.2d 355 (1985); *In re Sean H.,* 24 Conn. App. 135, 144–45, 586 A.2d 1171, cert. denied, 218 Conn. 904, 588 A.2d 1078 (1991). It does not permit the termination of parental rights based on speculation as to what acts may befall a child.

Here, Kelly has been in the custody and control of the commissioner since shortly after her birth. No injury has befallen her as a result of acts of commission or omission by her parents. The trial court itself recognized this when it observed that "there is no evidence that Kelly has been *actually* neglected or uncared for by the parents, as she has since birth been either in a hospital or competent foster home." (Emphasis in original.) Thus, she could not have been denied the care, custody or control necessary for her physical, educational, moral or emotional well-being by reason of parental acts of commission or omission while in foster care. See *In re Shannon S.,* 41 Conn. Sup. 145, 157, 562 A.2d 79, aff'd, 19 Conn. App. 20, 560 A.2d 993 (1989).

The trial court's reliance on *In re Juvenile Appeal (84-AB)*, 192 Conn. 254, 471 A.2d 1380 (1984), and *In re Nicolina T.*, 9 Conn. App. 598, 520 A.2d 639, cert. denied, 203 Conn. 804, 525 A.2d 519 (1987), was misplaced. Both of those cases concerned circumstances of serious physical injury, and accompanying emotional trauma, to the children involved. This was also true in *In re Theresa S.*, supra, and in *In re David E.*, 4 Conn. App. 653, 496 A.2d 229 (1985), the cases relied on in *In re Nicolina T.*, supra. Furthermore, while we share the trial court's concern for Kelly's well-being, we do not believe our more limited interpretation of § 45a-717 (f) (2) will "require this child to be placed in the custody of parents who clearly are and will be incapable of providing even basic care for her let alone the specialized care that [she] needs, for the sole purpose of demonstrating that she will suffer actual harm" as suggested by the trial court. As already discussed, Kelly's commitment to the custody of the commissioner is amply supported by the record. See part II, supra. Pursuant to General Statutes § 17a-112 (b) (2), parental rights may be terminated where "the parents of a child who has been found . . . to have been neglected or uncared for in a prior proceeding have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, they could assume a responsible position in the life of the child . . . ."[6] On this ground, termination can occur without the child's ever being in the custody of the parents. By contrast, the termination of parental rights under the ground relied on in the petition, that is, where a child has been denied necessary care, guidance or control by reason of parental acts of commission or omis-

[6] It is significant, in our view, that the "personal rehabilitation" ground set forth in General Statutes § 17a-112 (b) (2) cannot be relied on in a coterminous petition for termination of parental rights pursuant to General Statutes § 45a-717.

sion, requires proof of specific conduct that has caused serious injury to the child. *In re Theresa S.*, supra; *In re Nicolina T.*, supra. Lacking evidentiary support for this conclusion, the judgment of the trial court terminating parental rights pursuant to § 45a-717 (f) (2) cannot be sustained.

## B

The respondent also claims that General Statutes § 45a-717 (f) (3) cannot provide the basis for the termination of parental rights in this case. We agree.

Section 45a-717 (f) (3) permits the termination of parental rights where "there is no ongoing parent child relationship . . . ." Recently, in *In re Valerie D.*, 223 Conn. 492, 526–35, 613 A.2d 748 (1992),[7] our Supreme Court interpreted § 45a-717 (f) (3) in the context of a proceeding based on coterminous petitions for custody and termination of parental rights with respect to an infant where the infant was taken from the parent shortly after birth. There, as here, "the lack of an ongoing parent-child relationship between the respondent and the child was the direct result of the fact that the child was in foster care apart from the respondent for almost the entire period of time between the birth and the adjudication date." Id., 531.[8] Under those facts, the *Valerie D.* court concluded that § 45a-717 (f) (3) would not authorize the termination of parental rights. The court observed that once the child was placed in fos-

---

[7] We note that *In re Valerie D.*, 223 Conn. 492, 613 A.2d 748 (1992), was decided after the trial court decided this case.

[8] In fact, in this regard the trial court quite succinctly observed that "no ongoing parent-child relationship exists between the parents and Kelly. Nor could there be. The [order of temporary custody] and coterminous petitions were filed three days after her birth. During the child's stay at Day Kimball Hospital, the mother did see the child for brief times . . . [but] there was no opportunity for the child to bond to her mother." The court also observed that the supervised visitation sessions "did not permit the child to develop any recognition of the parents as her parents."

ter care pursuant to an order for temporary custody under § 46b-129, a finding of a lack of an ongoing parent-child relationship soon thereafter was inevitable. The court therefore refused to apply §§ 45a-717 (f) (3) and 46b-129 "to enable the petitioner to gain and maintain custody of a newborn infant pursuant to § 46b-129 under circumstances, as in this case, that will lead almost inevitably to the ground for termination under § 45a-717 (f) (3)." Id., 533. To conclude otherwise, the court reasoned, would allow the factual predicate for custody, established by the lesser standard of a preponderance of the evidence, to lead inexorably, for all practical purposes, to the factual predicate for termination required to be established by the higher standard of clear and convincing evidence. Id., 533–34. The court refused to interpret § 45a-717 (f) (3) to permit such a scenario. Consequently, the *Valerie D.* court concluded that the fact that the custody determination was permitted to lead directly to the termination determination "fatally undermine[d] the finding of a lack of an ongoing parent-child relationship under § 45a-717 (f) (3)." Id., 535.

The factual setting of *Valerie D.* and the analysis of the Supreme Court in that case appear to be on all fours with this case. Kelly was taken from the respondent at birth by DCYS pursuant to an order of temporary custody. The lack of an ongoing parent-child relationship in this case, as in *Valerie D.*, appears to be the direct result of that custody determination. Accordingly, the termination of the respondent's parental rights cannot be sustained under § 45a-717 (f) (3).

Neither ground relied on by the trial court to terminate the respondent's parental rights is supported by the record. "Our statutes and caselaw make it crystal clear that the determination of the child's best interests comes into play only *after* [the] statutory grounds for termination of parental rights [relied on in the peti-

tion] have been established by clear and convincing evidence." (Emphasis in original.) Id., 511. We do not disturb the trial court's custody determination pursuant to § 46b-129, but we conclude that the trial court improperly determined that the record supports the termination of the respondent's parental rights under the applicable statute, § 45a-717.[9] While custody of Kelly will remain with the commissioner, this petition for termination of the respondent's parental rights must be denied.

The judgment is affirmed as to the child's commitment to the custody of the petitioner. The judgment is reversed as to the termination of the respondent's parental rights, and the case is remanded with direction to render judgment for the respondent on the petition for termination of parental rights.

In this opinion the other judges concurred.

[9] Because we conclude that the grounds alleged in support of the termination of the respondent's parental rights are not supported by the record, we do not address the respondent's claim that the commissioner failed to provide sufficient services aimed at reuniting her with her child.