[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Nature of Proceedings
On February 10, 1995, nearly two years after being first placed in the custody of the Department of Children and Families (DCF), Lin F., born 7/15/92, became the subject of this petition by which DCF seeks to terminate the parental rights of his parents, Eunice F. and Morris M., so that, after spending all of his life to date out of their care, he could know the security of permanency through adoption.
Service was confirmed at the initial hearing on 3/8/95 which was attended by the father and the attorneys for each parent. Eunice did not appear in court until 4/11/95 at which time a Guardian Ad Litem was appointed to represent her best interests in view of her psychiatric history. Denials were entered on behalf of both parents on 6/13/95 and the following week the court granted the petitioner's motion for a psychological evaluation of the parties and their interactions, notwithstanding the mother's refusal, communicated through her attorney, to participate.
At trial on 2/2/96, counsel for the father submitted his client's written consent to the termination of his parental rights, executed in his attorney's presence the previous day. Petitioner offered the testimony of two clinical witnesses and the DCF social worker. The mother testified in narrative form (Practice Book Sec. 1049.1(1)) and offered no other evidence. All parties waived the opportunity to submit written trial memoranda, and decision was reserved at the close of the trial day.
In the absence of amendments to the pleadings, the adjudicatory date of this petition is 2/10/95 (P.B. Sec. 1042.1, subsection 4), and the dispositional date 2/2/96 (P.B. Sec. CT Page 1920 1043.1, subsection 1), the day of trial.
Facts
Evidence offered at trial, interpreted in the light of the prior record in this court concerning this child, supports the following findings of fact:
1. Neither parent has ever had the care of this child since his birth on 7/15/92.
2. Because of the mother's psychiatric condition at that time, and the father's continuing unwillingness to assume sole responsibility for the care of this child, Lin was placed directly from birth with his maternal grandmother who was awarded custody by the Probate Court on 9/10/92.
3. After Lin was found alone with the body of his recently deceased grandmother in February of 1993, DCF, having ascertained the inability of both parents to assume his care, secured temporary custody. On 10/21/93, on pleas of nolo contendere
entered by each parent with the advice of their separate counsel, the court found Lin to be uncared-for in that neither parent was then able to provide him with an adequate home, and committed the child to DCF for an initial period of 18 months.
4. At the time of commitment, the court authorized liberal visitation for the mother, starting with a three-hour supervised visit each week. Five months later the court ordered two three-hour unsupervised visits each week unless there were good cause for reducing this access. Two months later, on 4/6/94, supervision was again required after the mother was observed striking the child in the face (State's Exh. G, p. 12) and on 5/5/94 the court ordered supervised visits only, to be held twice weekly. In the spring of 1995 the duration of these visits was reduced from three hours to one hour based upon the mother's behaviors during visits, the nature of her interaction with her son and the negative effect on the child of longer visits. (Id.; testimony of Carol Kennedy.) While Eunice was fairly compliant with this schedule prior to the institution of this action, in the year of its pendency, out of 100 potential visits (twice a week from 2/10/95 to 2/2/96), she failed to keep more than half, at times offering no explanation, at other times being inaccessible by telephone so that DCF could learn the reason for her nonappearance. CT Page 1921
5. Evaluations conducted by clinical psychologist Dr. Hedy Augenbraun (State's Exhibits C, D, E and F) recommended termination of parental rights as being the permanent plan required to secure Lin's best interests:
 Ms. F.'s paranoia and problems in relationships also interfere with her ability to parent adequately. She is likely to interpret any lack of attention as rejection . . . her emotional state would significantly compromise her ability to be an effective parent . . . Due to Ms. F.'s paranoia, she would have great difficulty learning good parenting skills. She believes that she has been poisoned by her ex-husband's family members. It would be very difficult for her to make an adequate adjustment, to monitor her child's needs and to refrain from projecting blame and denying responsibility for her own behavior . . . her ability to control her behavior is limited due to her mental illness. This would have a negative impact on Lin.
(State's Exh. F, p. 2.) At the trial, Dr. Augenbraun testified that the mother's psychiatric condition would interfere with her ability to relate to and care for a child: Her moods were unstable, she was quick to anger, her cognitive distortions lead to delusional thinking. These characteristics would result in her misinterpreting the child's behavior and acting inappropriately and unresponsively to his needs. Her lack of ability to empathize, a necessary quality of adequate parenting, interferes with all of the mother's personal relationships, leading her to feel easily rejected, to project blame on others, to misinterpret others' words and deeds, and to be to be inconsistent in responding to others.
These conclusions, based upon evaluations conducted in the summer of 1994, were remarkably consistent with those reached by the psychiatrist, Dr. David Gianetti who had evaluated the mother a year earlier. (State's Exh. A.) At that time he found:
 While her psychosis is in partial remission, the problem of more acute "decompensations" — as apparently occurred during her last pregnancy — still exists . . . Overall, while her IQ is average or above average, her judgment is impaired by her misperceptions of reality.
(Id., p. 4.) In his testimony, Dr. Gianetti predicted that she CT Page 1922 could maintain herself outside of hospitals if she continued taking psychotropic medication, but he was "less optimistic" about her extending her functioning to include parenting. Even with medication, statements she made to him in July of 1993 suggested that her misperception of reality would result in impaired judgment. If entrusted with the care of a child she could be "overwhelmed", resulting in "decompensation".
6. The mother's hearing impairment was not the basis of any of the conclusions reached by either of the clinical evaluators.
Adjudication — on facts as of 2/2/95
Father: His consent to the termination of his parental rights was found to be voluntary and knowingly given with the advice of counsel and is accepted as a valid ground for terminating his parental rights. On the day of trial, the oral motion of the petitioner to add to its petition consent by the father was granted by agreement of all parties. The other, nonconsensual, grounds pleaded for terminating his parental rights are thereforedismissed without finding or prejudice.
Mother: At a hearing on 3/22/95, the court granted a motion to strike one of the three nonconsensual grounds originally pleaded for terminating the parents' rights, namely the lack of parent-child relationship, on the authority of In Re Jessica M.,217 Conn. 459 (1991) and In re Kelly S., 29 Conn. App. 600 (1992). At the conclusion of trial, a second ground was dismissed, that of the denial of essential care by reason of parental acts of commission or omission. No evidence was offered by the petitioner that Lin had ever been denied any care since his birth, and what care he might have been denied would have had -to have been the responsibility of his legal custodians (first the grandmother; later DCF) and not that of a parent who had never been permitted to exercise custody. The only opportunity this mother ever had to provide any kind of care was during visitation, and the problems observed during those visits (lack of, or inappropriate, responsiveness to the child; bizarre behavior on occasion; the single episode of slapping the child's face), even in combination, do not rise to the dignity of such denial of care sufficient to support an adjudication on this ground. This ground is, therefore, dismissed. he petitioner has, however, provided clear and convincing proof that Lin's mother was no nearer, on the adjudicatory date, to being able to provide adequately for his daily care than she was on the date of his commitment to DCF CT Page 1923 (10/21/93) or, indeed, on the day he was born. That is the ultimate test for the remaining ground pleaded under Sec. 17a-112, subsection a:
(2) the parent of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child.
The fact that Eunice's incapacity for parenting stems from a psychiatric illness over which she has no control does not prevent this ground from being relied upon for the purpose of freeing her son for adoption. A parent's inability to rehabilitate has the same impact on the child's well-being as does a parent's unwillingness to rehabilitate. The state has provided unrefuted expert clinical evidence that supports the conclusion that even conformity with her psychiatric treatment requirements will not render her able, within the foreseeable future, to provide adequate parenting for this child
Before a court may terminate parental rights, however, it must consider the seven elements that are set forth in subsection (d) of Sec. 17a-112:
1. DCF provided all of the services it could to facilitate the reunion of Lin with his mother. It promoted frequent visits of relatively long duration, permitting them to become unsupervised until inappropriate behavior by the mother necessitated resumption of supervision. It provided transportation for such visits until threats by the mother precluded continuation of this service. Because of her disabilities, her housing and source of income were assured without DCF assistance and she apparently always had adequate psychiatric care.
2. DCF made reasonable efforts to reunite Lin with his mother at the outset of the commitment by providing generous visitation which was only reduced when required to secure the child's best interests.
3. No court orders were entered into in this case other than for the mother to come to court and to keep appointments with clinical evaluators. After several continuances the presence of the mother was secured at the time of trial. She refused to keep CT Page 1924 the appointment made for her with the evaluator selected for this petition, although she had kept earlier appointments with other clinical evaluators in 1993 and 1994.
4. Lin knows who his mother is and enjoys her visits to a limited extent. This, however, is in marked contrast with the strong connection he displays toward his foster parents who have had his care for more than two thirds of his life and are willing to adopt him should he become free for adoption. DCF would approve this plan and is confident that should they become unavailable, other suitable adoptive parents could be found.
5. Lin is three and a half. Soon he will enter the wider world of public school and should not have to wait longer to be "home for good".
6. The mother has apparently conformed to the requirements of her psychiatric treatment and has succeeded in avoiding hospitalization throughout the period Lin has been committed to DCF. She exercised her visitation rights satisfactorily until the year preceding the trial when, despite the pendency of this action, she visited less than half the times she was permitted. She has cooperated with DCF except for those periods when she was inaccessible by telephone.
7. The only impediment to Eunice's maintaining a meaningful relationship with Lin is her own mental state that made it difficult for her to maintain healthy relationships in general. While she saw her son frequently in the first year of his commitment, her occasionally inappropriate behavior with, and responses to, him during visits caused his reaction to her to be more wary and more distant than in a normal mother-son relationship. No one acted unreasonably to prevent Lin and his mother from developing an appropriate relationship, nor did her financial condition contribute in any way to that situation.
It is, therefore, found that grounds exist to terminate the rights of each parent — the father by reason of his consent; the mother by clear and convincing proof of her failure to rehabilitate. It is further found, by clear and convincing evidence, that it is in Lin's best interest to end his status as a state ward and for him to know the security of a permanent home through adoption by his foster parents or, should they become unavailable to fill this role in his life, by another family equally capable of providing Lin with secure nurturing care for CT Page 1925 the balance of his minority. It is further found that DCF made every reasonable effort possible to facilitate reunification of this child with his mother.
Judgment
The parental rights of Eunice F. and Morris M. in and to their son, Lin F. are hereby ordered to be terminated. It is further ordered that the Commissioner of DCF be appointed statutory parent for the purpose of placing the child in adoption, and to secure adherence to this goal it is furtherordered that DCF file with this court a written report as to the progress toward such adoption within 90 days of the date of this judgment. If adoption has not been finalized by March of 1997, the Commissioner is further ordered to file a Motion to Review Plan for Terminated Child during that month to be heard no later than fifteen months following the date of this judgment.
Entered at Bridgeport this 18th day of March, 1996
Frederica S. Brenneman, Judge