MEMORANDUM OF DECISION
This is an action for termination of parental rights brought by the Department of Children and Families (DCF). The respondents are Julie K., who is the unmarried female biological parent of the minor child, Sarah Ann K., and Henry L., the unmarried male biological parent of the minor child. The respondents have both been served with process and have appeared and were represented by counsel throughout the trial of this case which commenced on January 8, 1997. Additionally, a guardian ad litem had previously been appointed for the mother. Neither parent seeks to revoke the child's commitment to DCF or to remove their daughter from the home of the foster parents since neither is in a position to presently care for the child. They both resist a termination of their parental rights.
During the four days of trial, the court heard from two DCF caseworkers; the "Birth to Three" coordinator; the foster mother; Dr. Richard Sadler, a board certified child psychiatrist and the evaluator appointed by the court; a parent aid coordinator for Child and Family Services; the, director of a half-way house facility; and the assistant coordinator of the Family Aid Program CT Page 521-E for the Family Service Association. Twenty two exhibits were offered into evidence. The court has carefully considered the various documents, social studies and psychiatric evaluations as well as the testimony of all of the witnesses and makes the following findings of fact.
 I. SERVICES
BIOLOGICAL MOTHER:
The minor child, Sarah Ann K., was born on November 6, 1994. DCF received a referral from the hospital social worker where the child was born indicating that the child's female biological parent appeared to be mentally limited and possibly unable to parent the child.
The mother, Julie K., was interviewed at the hospital by a DCF caseworker. The mother indicated that she felt unable to care for the minor child and that she was afraid to have the child in her care. The hospital staff noted that Julie was very uncomfortable, awkward and unfamiliar with caring for the infant. The mother and the caseworker discussed the alternatives and Julie agreed that it would be appropriate to voluntarily place CT Page 521-F the child in foster care since there were no available relatives to care for the child and the child's father, Henry L., was then incarcerated on drug charges in a Connecticut correctional center. Julie further indicated to the caseworker that although she had an apartment, her utilities had been disconnected and she did not have adequate furniture and furnishings to care for the minor child. The DCF caseworker also learned that Julie had a history of mental health problems.
Shortly after the birth of Sarah Ann on December 18, 1994, Julie entered into a service agreement with DCF. The goal of the service agreement was to ultimately achieve reunification of the mother and child. (Petitioner's Exhibit #8). Under the terms of that service agreement the foster parents were to host the mother at their home for visitation and to supervise and teach Julie basic child care skills including bathing, feeding and clothing the newborn child. Julie, the mother, was to attend each visit in order to learn parenting skills. DCF provided transportation for Julie to visit Sarah three times a week. Those visits occurred regularly in December, 1994 and January, 1995.
In February of 1995, Julie met with Sarah twice and then only once in April of 1995. In the period between April, 1995 and January, 1997, Julie made only two visits with the minor child. Not surprisingly, Sarah Ann does not recognized Julie and there CT Page 521-G is no parent-child relationship at this time, if ever there was one.
The DCF caseworker testified that DCF provided numerous services to aid and assist the possible reunification of Julie and her child. The social worker listed the Katie Blair House as a resource. The Katie Blair House is a shelter for women and children offering assisted living programs for mothers. The court finds that this service was not in fact provided or available since Julie was ineligible for this service after the child was taken into placement. Similarly, the social worker testified that the WIC program was made available to Julie. This is a federal aid program for women, infants and children (thus, the acronym "WIC"). However, Julie was ineligible for this program because the child was not living with her. In fact, this program was not actually available to Julie.
There were relevant services made available and accessible to Julie and, while it is not clear that the services were actually offered by DCF, the services were aids to reunification and DCF was aware that the services were in place and of assistance to the mother.[2] Those services included a Mother's Place, a service in New London which included parenting classes; New London City Assistance, a financial aid service which Julie accepted, the Thames Valley Council for Community Action (TVCCA), CT Page 521-H which assisted Julie in securing funding for an apartment; the Reliance House in Norwich which provided a shelter for Julie as well as caseworker services; and the Community Mental Health Services of Southeastern Connecticut which provided group and individual counseling, psychiatric evaluation and antidepressant medications. The record reflects that Julie has been very resistant to taking her prescribed psychotropic medications and has not attended counseling on a consistent basis. Julie has not had regular visitation with Sarah since April of 1995 and seems to have very little sustained interest in the child's life and activities. In summary, DCF offered or made available to the mother the following relevant services:
1) Visitation at the foster parents home.
2) Instruction on care of a newborn child.
 3) Mother's Place services for mothers including parenting classes.
4) City and state financial aid.
5) TVCCA services to find an apartment.
6) Reliance House shelter. CT Page 521-I
 7) Community based mental health services for individual and group counseling.
 8) Transportation services, as needed, for visitation and court attendance.
The court finds that the services offered to the mother were adequate, available, accessible and relevant.
BIOLOGICAL FATHER:
The child's male biological parent, Henry L., was born on August 15, 1952. He is now 44 years of age, he has never been married and has no other children. His father died when he was five years old and his mother subsequently suffered a nervous breakdown. Henry was placed in an orphanage and remained in various homes and schools until his graduation from high school at which time he joined the navy where he remained for eight years. While in the navy he became a skilled welder.
It appears from the evidence, the social study and the report of Dr. Richard Sadler, a psychiatrist who conducted an evaluation on Henry, that Henry is quite able to work and survive in strong, structured, institutional settings such as the orphanage, his CT Page 521-J school, the navy, and in community correctional centers. Henry has, however, had a difficult time in less structured environments.
Henry has a long history of criminal activity dating back to 1977. His record with the Connecticut State Police Bureau of Identification (Petitioner's Exhibit #6) shows nine arrests between 1988 and his last arrest in June of 1994 which resulted in a three year jail sentence for possession of narcotics. His arrests have been for breach of peace, burglary in the third degree, failure to appear, assault, larceny and possession of controlled substance charges.
Henry was offered visitation with Sarah Ann by DCF once a month while Henry was in a community correctional center. There were two such visits, one June 28, 1995 and one on August 29, 1995. (Petitioner's Exhibit #14). Henry was then released from prison and was placed in a half way house for "criminal justice clients." He remained in the half-way house for eleven months until September 1996. His visits with Sarah Ann did not occur between September, 1995 and December, 1995. No explanation for this four month lapse was offered either by the father or DCF.
The director of the half-way house, appeared and testified in court. She indicated that Henry was at all times compliant with CT Page 521-K the rules, he was tested twice monthly for the presence of drugs or alcohol with random breathalizer tests followed by urine analysis. She testified that he would have had at least twenty such tests in all during the nearly eleven months that he was in the program and that all tests were negative for drugs or alcohol.
Henry was able to procure employment while at the half-way house and was employed at the time of trial. The records reflect that during calendar year 1996 Henry was offered monthly visitation and exercised all twelve monthly visits. (Petitioner's Exhibit #14).
During court, the caseworker presented testimony with respect to the efforts that have been made to reunify the family. In reality, however, virtually all of the services were offered to the mother and very few services were offered to the father. While there was some suggestion that DCF offered substance abuse services to Henry, it does not appear that they were specific in the offer of such service nor does it appear, based upon his testing at the half-way house, that Henry was in need of such services. The only services actually offered to Henry were: (1) transportation to court to terminate his parental rights (hardly an aid to reunification) and (2) very modest monthly visitation services. CT Page 521-L
Completely without the assistance or knowledge of DCF, Henry secured stable housing for himself and a job. He attended a parenting program at the County Parent Aid program from April 30, 1996 through June 4, 1996 and a second program entitled "SOS! Help for Parents", a three week parent education workshop at the Family Service Association.
In the case of In re Shavoughn K., 13 Conn. App. 91, 98,534 A.2d 1243 (1987), cert. denied, 207 Conn. 805, 540 A.2d 374
(1988), the Appellate Court stated unequivocally that in deciding whether a parent has failed to achieve rehabilitation to the extent that a responsible role could be assumed in a child's life, the trial court must consider the six factors listed in General Statutes § 17a-112 (d), formerly known as § 17-43a (d). In re Shannon S., 19 Conn. App. 20 560 A.2d 993 (1989). This section, § 17a-112 (d)(1), includes "the timeliness, nature and extent of services offered or provided to the parent and the child by an agency to facilitate the reunion of the child with the parent". This has been recently amended by Public Act 96-246 to require proof of those efforts by clear and convincing evidence.[3]
The court finds that DCF did not offer the father adequate, available, accessible and relevant services to reunify CT Page 521-M him with his child. This is, indeed, unfortunate because the psychological evaluation strongly suggests that Henry will never be able to effectively parent the child because of his own limitations. Dr. Sadler describes Henry as follows:
Henry L. is a 44 year old father of one child. Mr. L's presentation and functional abilities are unchanged from his previous evaluation. Mr. L is, in my opinion, a narcissistic and psychopathic personality disordered man. He has functioned on the margins of relationships and he has demonstrated periods of functional working capacity on an intermittent basis over the years. Mr. L's working ability are testified to by his skills as a welder and his ability to work for protracted periods of time. Mr. L has not developed important relationships in his life. Mr. L gives no indication that Julie K. or Sarah Ann have influenced his behavior over the past years. Mr. L's lack of concern for his future development and the impact upon a child of a protracted foster care placement has no discernible emotional impact upon Mr. L. Mr. L's intellectual abilities are estimated to be within the average range. No depressive disorder, anxiety disorder, affective disorder or psychotic disorder is noted in Mr. L. The impairments in Mr. L's functional abilities appear to be entirely accounted for by his personality style which has been present, stable and functionally impairing over many years. Mr. L has shown no indication of an attempt to alter his style in order to CT Page 521-N minimally adequately care for his daughter. (Petitioner's Exhibit # 12)
Dr. Sadler concludes his report indicating that there is no longer any hope that either parent would be able to develop the ability to minimally adequately care for their daughter and that allowing further time to pass prior to a determination of parental rights would only prolong the state of Sarah's condition as a foster child. According to Dr. Sadler, Sarah will never be able to be cared for adequately by her parents.
Unfortunately, no expectations were ever developed nor were any service agreements entered into between the father and DCF. Those expectations, if thoughtfully prepared and adopted, might have required the father to: (1) obtain housing suitable for himself and his daughter, (2) avoid any further involvement with the criminal justice system, (3) enter into appropriate individual counseling and therapy to deal with his longstanding functional impairment, (4) if not an acknowledged parent, execute a written affirmation of paternity and enter into an order of support in accordance with General Statutes § 46b-171, (5) if an acknowledged parent, referral to the child support enforcement unit of the department of social services for pursuit of child support in accordance with the Child Support Guidelines General Statute § 46b-215b and, as required by General Statute § CT Page 521-O46b-130; and (6) regularly visit the child as often as DCF shall reasonably permit.
Since DCF did not adopt and monitor expectations either formally or informally with the father, the court is unable to fully evaluate the father's rehabilitative efforts.[4] The self-directed efforts of the father suggest, however, that he was motivated to comply with any such reasonable expectations. The court finds that reasonable efforts were not made by DCF to reunite the child with the male biological parent.
 II. THE INITIAL COMMITMENT
Regrettably, the petitions and allegations, with respect to the parents, present a whole other set of problems often seen in child protection cases. Sarah Ann was born on November 6, 1994. The child has been in foster care since November 10, 1994 when DCF obtained the voluntary placement agreement from the child's mother. The father of the child was, as earlier noted, incarcerated.
On December 19, 1994, the DCF caseworker prepared and filed with the Superior Court for Juvenile Matters, a DCF pre-printed CT Page 521-P form affidavit indicating:
That this child is currently in an out-of home placement pursuant to a voluntary permission to place and maintaining said child in an out-of-home placement is in the child's best interest because of the following conditions: (form language frompre-printed affidavit, to which the social worker added thefollowing:)
"Mother has stated that she is afraid to be with the child alone.
 Mother's interaction with the child is tentative and she needs specific instructions on how to hold, feed and change the baby."
On the same date in December the DCF worker filed a JD-JM-38 petition with the Superior Court for Juvenile Matters in the appropriate venue. The petitioner checked boxes indicating the, child was a "NEGLECTED CHILD" and an "UNCARED FOR CHILD".[5]
The form, and General Statutes § 46b-129 (a), require the person petitioning to support the allegations with facts. The language used by the DCF workers has been taught to them at the DCF Training Academy and is passed along from worker to worker. The language tracks the statutory language. Accordingly, the CT Page 521-Q worker, adopting the customary language and attempting to adapt it to the facts of this case, wrote the following:
 1) the child is being denied proper care and attention, physically, educationally, emotionally and morally.[6]
 2) The child is being permitted to live under conditions and circumstances or associations injurious to her well being.[7]
 3) Due to the child's age, she has specialized needs which cannot be met in mother's home.
To Wit:
 1) Mother, Julie K., has stated that she is afraid to be alone with the baby.
 2) The foster mother, Eileen B., and the social worker, (named), have observed that mother has no knowledge of infant care and needs specific instructions on how to feed and clothe and change the baby.
 3) According to mother's previous therapist, (named), mother has no insight into the, quality of a safe living environment. CT Page 521-R
 4) (The mother's therapist named) stated that mother has been offered therapy services in the past but has not followed through with appointments.
5) Father is in jail on drug charges.
It is difficult for this court to understand how an allegation could be made that either the mother or the father had committed any negligent acts.[8] The record reflects that the mother was mentally challenged and exercised her faculties appropriately by voluntarily placing the child in foster care. This act by the mother was clearly in the child's best interest. The father was in the custody of the Commissioner of Corrections, he never had the physical ability to act either; favorably or unfavorably toward the child.
The only ground alleged which appears to be appropriately claimed, was "Due to the child's age, she has specialized needs which cannot be met in mother's home." All other neglect grounds do not appear to be applicable. For purposes of commitment of a child to the custody of the; commissioner pursuant to General Statutes § 46b-129, proof of ongoing parenting deficiencies is sufficient to satisfy the statute where those deficiencies mean that the child's home is unable to provide the care required CT Page 521-S for her special needs. In re Kelly S., 29 Conn. App. 600, 613,616 A.2d 1161 (1992). In the context of § 46b-129, this court believes that a "home" requires two ingredients: 1) adequate shelter and 2) a competent caretaker. The activity required to care for a newborn infant may be described as "special needs." Sarah Ann did not have a home within the contemplation of the statute and did have special needs, that is, the need for newborn care.
 III. THE TERMINATION PETITION
The child was subsequently found to be neglected and uncared for "by admission of the parents" and committed to the Commissioner of the Department of Children and Families on September 21, 1995. Five months later on February 13, 1996, a DCF program supervisor, acting for the Commissioner, filed a petition to terminate the parental rights of the biological parents.
The judicially approved form for petition to terminate parental rights allows the petitioning individual or agency to check applicable boxes regarding grounds for termination. The petitioner again, did not make a good faith, critical analysis CT Page 521-T regarding which non-consensual grounds to allege in the petition. Accordingly, ever, v possible ground for a contested termination of parental rights was alleged even though most of the grounds were inappropriate.
While this practice may be understood by the lay social worker, unskilled in legal theory, as `covering all the bases,' it is hardly an acceptable practice for an attorney and Commissioner of the Superior Court.[9] The petitioner, accordingly, checked the following boxes as relevant and applicable to this case:
 (1) The child has been abandoned by the mother/father in the sense that the parent(s) failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child;
 (2) The child has been found in a prior proceeding to have been neglected or uncared for. The mother/father has/have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of the child, he/she/they could assume a responsible position in the life of the child.
(3) the child has been denied, by reason of an act or acts of CT Page 521-U parental commission or omission by the mother/father the care, guidance or control necessary for his physical, educational, moral or emotional well-being. Nonaccidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights;
 (4) there is no ongoing parent-child relationship with respect to the mother/father which is defined as the relationship that ordinarily develops as a result of a parent having met on a continuing, day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of the parent-child relationship would be detrimental to the best interests of the child.
The petition must state the facts upon which the termination is sought and the legal grounds for authorizing termination. General Statutes § 45a-715 (b)(6) and § 17a-112 (a). The following is appended to the petition as the "particular facts upon which termination is sought"[10]:
 This family has an extensive history with the Department of Children and Families dating back to November 1994, revolving CT Page 521-V around issues of Ms. K.'s significant mental health concerns, lack of appropriate support, parenting issues, and Ms. K's request to have her newborn child placed in foster care.
 On 11-6-94, Ms. K gave birth to Sarah Ann K., and signed a Voluntary Agreement to place her in foster care on 11-10-94.
 On 9-21-95, Sarah was committed to the Department of Children and Families as a neglected and uncared for child.
 Ms K. has refused all services which would facilitate reunification including visitation.
Ms K. has made two visits with Sarah since 4-7-95.
 Mr. L., father, has been incarcerated since 6/94. He has visited with Sarah on six occasions.
 Sarah K. has been in foster care since birth. She is in need of a permanent placement which can provide her with the structure and security she needs and can adequately meet her emotional, psychological and physical needs.
On the basis of the facts set forth, the DCF caseworker, with the subsequent acquiescence of the assistant attorney general CT Page 521-W assigned to this case,[11] allowed this case to go to trial on the basis of all four possible contested grounds for termination of parental rights.[12] This court disapproves of this "shot-gun style" method of pleading and trial practice.[13]
"[T]he termination of parental rights is defined, in General Statutes § 45-61b (g) [now § 45a-707 (g)], as the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent. . . . It is, accordingly, a most serious and sensitive judicial action. Anonymous v. Norton, 168 Conn. 421, 430,362 A.2d 532, cert. denied, 423 U.S. 935, 96 S.Ct. 294,46 L.Ed.2d 268 (1975). Although the severance of the parent-child relationship may be required under some circumstances, the United States Supreme Court has repeatedly held that the interest of parents in their children is a fundamental constitutional right that undeniably warrants deference and, absent a powerful countervailing interest, protection. Stanley v. Illinois,405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); see also Inre Juvenile Appeal (83-CD), [supra, 295] (noting that it is both a fundamental right and the policy of this state to maintain the integrity of the family). Termination of parental rights does not follow automatically from parental conduct justifying the removal of custody. The fundamental liberty interest of natural parents in the care, custody, and management of their child does not CT Page 521-X evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life.Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388,71 L.Ed.2d 599 (1982).' (Internal quotation marks omitted.) In re JessicaM., supra, [217 Conn. 459, 464-65, 586 A.2d 597 (1991)]." In reValerie D., 223 Conn. 492, 514, 613 A.2d 748 (1992)
Given the gravity of the consequences inherent in termination proceedings, the finality of the outcome on the parents, children and caretakers, as well as the concern of the court for the proper procedural and substantive application of the law and the protection of all parties, the court will examine each of the allegations claimed by the petitioner to determine whether such claims were made in good faith on the basis of the facts and the law.
A. Petitioners claim re abandonment:
"The child has been abandoned by the mother/father in the sense that the parent(s) failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child." (DCF Petition).
An argument can be made that abandonment applies to the CT Page 521-Y mother since she appears to have lost interest in Sarah Ann after the child was placed in foster care. The law in this regard is clear and generally accepted that "where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred". In reJuvenile Appeal (Docket No. 9489), 183 Conn. 11, 438 A.2d 801
(1981). In re Migdalia M., 6 Conn. App. 194, 209, 504 A.2d 532
(1986). The law is also clear, however, that Placing the child in voluntary placement does not in itself constitute a basis for claiming abandonment nor does it provide the sole basis for such a claim. "The belief that the foster parents are better able to care for her daughter is not necessarily an indication that she has statutorily abandoned her child, but may be an indication that she places her daughter's health above her own desire to be with her daughter on a daily basis". In re Migdalia M., supra,6 Conn. App. 210.
It is equally clear that incarceration alone may not be the sole basis for a claim of abandonment by the father. In reJuvenile Appeal (Docket No. 10155), 187 Conn. 431, 443,446 A.2d 808 (1982). In re Juvenile Appeal (84-6), 2 Conn. App. 705, 711,483 A.2d 1101 (1984), cert. denied, 195 Conn. 801, 487 A.2d 564
(1985). "On the other hand, the inevitable restraints imposed by incarceration do not in themselves excuse a failure to make use CT Page 521-Z of available though limited resources [to maintain contact with a child]." In re Juvenile Appeal (Docket No. 10155), supra,187 Conn. 443. In this case, the father exercised all permitted visitation, including visitation while incarcerated, he obtained employment, obtained shelter, submitted to substance abuse screening, attended two parenting education programs, he has resisted efforts to terminate his parental rights by actively participating in the proceedings and has continuously maintained an interest in his daughter. The record does not support a good-faith claim of abandonment against the father. The record and testimony suggest that the caseworkers did not place much attention in reuniting the father and the daughter.
B. Petitioners claim re acts of parental commission or omission
"The child has been denied, by reason of an act or acts of parental commission or omission by the mother/father the care, guidance or control necessary for his physical, educational, moral or emotional well-being. Nonaccidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights." (DCF Petition).
This provision authorizes the termination of parental rights CT Page 521-AA where specific acts of parental commission or omission have caused serious physical or emotional injury to the child. See Inre Theresa S., 196 Conn. 18, 25-27, 491 A.2d 355 (1985); In reSean H., 24 Conn. App. 135, 144-45, 586 A.2d 1171, cert. denied,218 Conn. 904, 588 A.2d 1078 (1991). It does not permit the termination of parental rights based on speculation as to what acts may befall a child. In re Kelly S., 29 Conn. App. 600, 614;616 A.2d 1161 (1992).
Here, as in the case of In re Kelly S., the child has been in the custody and control of the commissioner since shortly after her birth. No injury has befallen her as a result of acts of commission or omission by her parents as she has since birth been either in a hospital or in a competent foster home. "Thus, she could not have been denied the care, custody or control necessary for her physical, educational, moral or emotional well-being by reason of parental acts of commission or omission while in foster care." See In re Shannon S., 41 Conn. Sup. 145, 157, 562 A.2d 79, aff'd, 19 Conn. App. 20, 560 A.2d 993 (1989), In re Kelly S.,
supra, 29 Conn. App. 615. The termination of parental rights under this ground alleged in the petition, that is, that Sarah Ann has been denied necessary care, guidance or control by reason of parental acts of commission or omission, requires proof of specific conduct that has caused serious injury to the child. The record is bare of any specific parental acts of omission or CT Page 521-BB commission. This is not a novel proposition of law. It is well known to petitioner's counsel.[14] The record does not support this allegation against either of the parents.
C. Petitioners claim re no ongoing parent child relationship
"There is no ongoing parent-child relationship with respect to the mother/father which is defined as the relationship that ordinarily develops as a result of a parent having met on a continuing, day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of the parent-child relationship would be detrimental to the best interests of the child." (DCF Petition).
Under nearly identical facts, the Supreme Court in In reValerie D., supra, 223 Conn. 492, concluded that this provision would not authorize the termination of parental rights. The court observed that once the child was placed in foster care pursuant to an order for temporary custody under § 46b-129, a finding of a lack of an ongoing parent-child relationship soon thereafter was inevitable. The court therefore refused to apply General Statutes § 45a-717 (f)(3), the probate section of the General Statutes which contains nearly identical language to § 17a-112
(b)(4), and § 46b-129 to enable the petitioner to gain and CT Page 521-CC maintain custody of a newborn infant pursuant to § 46b-129
under circumstances, as in this case, that will lead almost inevitably to the ground for termination. Indeed, the testimony of the petitioner's own witness supports the conclusion of the Supreme Court. Dr. Sadler testified in court and in his report of October 5, 1996 that "Mr. L. indicates that he has visited his daughter on an approximately once per month basis for a one hour length of time over the past year. This degree of contact would not allow a parent/child relationship to develop. "
 "A parent, faced with a petition for custody under § 46b-129, may feel that she is unable to care properly for her newborn infant and, therefore, may acquiesce in that petition, as occurred in this case. That acquiescence, moreover, was in the child's best interests. To permit that acquiescence to ripen into a ground for termination of parental rights, however, simply by virtue of the practical impossibility of maintaining the kind of contact with the child required to establish an ongoing parent-child relationship, would turn the statutory promise of appropriate care for the child into a cruel statutory hoax of termination of parental rights. We do not believe that the two statutes contemplate such a result". In re Valerie D., supra, 223 Conn. 534.
The holding in the case of In re Valerie D., is established CT Page 521-DD and well settled law. It is not a novel proposition nor was the validity of it challenged in court. The record does not support a basis for this allegation against either of the parents.
D. Petitioner's claim re failure to rehabilitate
"The child has been found in a prior proceeding to have been neglected or uncared for. The mother/father has/have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of the child, he/she/they could assume a responsible position in the life of the child." (DCF Petition).
This ground for termination is the only ground which may have clear applicability to both parents. This ground is applicable even where a parent is successful in maintaining employment and remaining substance free. In re Christina V., 38 Conn. App. 214,219, 660 A.2d 863 (1995). It is applicable where the visits between parent and child are not productive, where the child reacts negatively to the visits, where the child is closely bonded to the foster family, where counseling does not substantially increase parenting skills, where the parent, with the best of intentions, personally may be incapable of overcoming deficiencies in parental skills. In re Luis C., 210 Conn. 157,169, 554 A.2d 722 (1989). The trial court in the Luis case, CT Page 521-EE however, was able to make a finding that DCYS, now DCF, had made reasonable efforts to reunify the respondent with Luis. Regrettably, the record in this case does not support a finding of reasonable efforts to reunify the child with the father.
 IV. ADJUDICATION
The record is sufficient to proceed against the respondent mother alone. The court finds that DCF has made reasonable efforts to reunite the mother and child without success. The record is sufficient to find, and the court finds by clear and convincing evidence, that the child has previously been found to be uncared for, the mother has failed to rehabilitate herself and it does not appear that within a reasonable time that she could assume a responsible position in the life of this child. However, it would be difficult to find that it is in the child's best interest to terminate the parental rights of one parent and not the other in this case at this time. Such an action in the present case would not advance the permanency planning for the child[15]. No testimony was presented that suggested a benefit to terminating only one parent's parental rights.
ORDER
CT Page 521-FF
The respondent father, who has a job and could be employed as a skilled welder, is ordered to pay the sum of $45 per week as nominal child support through the Bureau of Child Support Enforcement in the Judicial District where he resides. Said payment shall be in favor of the State of Connecticut and may be applied toward foster care maintenance payments pursuant to General Statutes § 46b-130. The respondent father is further ordered to maintain medical insurance for the benefit of Sarah Ann, if available through his place of employment.
The petition for termination of parental rights against the father is dismissed without prejudice to reinstitute an appropriate petition predicated upon a good faith assessment of the facts and the law and further provided that reasonable efforts have been made to reunify the father and the child. The parties are directed to establish expectations for the father within thirty days of the receipt of this decision.
The dispositional issues and mandatory considerations required by § 17a-112 (d) regarding the mother are reserved to subsequent proceedings, either involving the father and mother, or as against the mother alone in the event that the petitioner can establish that it would be in the child's best interest to terminate the mother's rights alone. CT Page 521-GG
Judgement may enter accordingly.
Foley, J.[16]