[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
Memorandum of Decision
Nature of Proceedings
By petition filed 8/1/95, and last amended on 3/13/96, the Commissioner of the Department of Children and Families (DCF) seeks to terminate the parental rights of Linda K. and Anthony G., mother and putative father of Gabriel K., born 9/2/93 and, since seven months of age, a foster child of Jean M. and her daughter, Cathy D.
Both parents appeared in response to abode service at the initial hearing on 9/21/95 and the matter was continued to secure the appearance of the attorney appointed to represent the father a year earlier in the proceedings that resulted in the child's commitment to DCF on 9/21/94. At the continued hearing on 10/18/95, Anthony's attorney appeared but Anthony did not. Pro forma denials were entered on behalf of both parents and psychological evaluations ordered on motion of the petitioner. For reasons that do not appear of record, evaluations were never conducted and the case did not appear on the court docket again until 2/15/96 at a hearing convened for the purpose of extending the child's initial commitment that would otherwise have ended on 3/21/96. The matter was continued to 3/1/96 at the request of the putative father's attorney. On that date, counsel for both parents but neither parent} appeared, and jointly requested a continuance of trial on the termination petition so that they could have more time to locate their respective clients. The commitment was extended for one year effective 3/21/96, without prejudice to action either on the pending petition to terminate parental rights or the parents' continuing right to seek revocation of commitment. A trial date certain was set for 4/26/96, at which time both parents and their respective attorneys appeared and trial began. A continuance date two weeks later had to be postponed because of the illness of the putative father's attorney. Two trial dates in June were marked off at the request of the putative father's attorney who had planned a vacation for that period. CT Page 8919
On 7/23/96, at a trial date twice continued for cause at the request of the putative father's counsel, the latter failed to appear, this time without notifying the court or his client. The court, suo moto, removed the attorney and ordered that a new attorney be appointed, that all prior testimony regarding the father be stricken and that the balance of testimony be heard with regard to the mother only. The matter was thus bifurcated with a separate trial set for the putative father to begin, with newly appointed counsel, on 9/19/96. After the petitioner rested and the mother's sole witness testified, Linda K. moved for a continuance to bring in two more witnesses: Her daughter and her pastor. The motion was denied since these witnesses had not been subpoenaed for this trial date which had been marked as firm and final, and, upon soliciting an offer of proof, the court found that the evidence that they would offer, even if stipulated as true by the other parties, would have no substantial effect upon the adjudication or disposition of this case. All sides then rested as to the mother at the end of the trial day on 7/23/96, and decision reserved until the trial could be concluded as to the termination of the putative father's rights. At the bifurcated trial concerning the putative father, held on 9/19/96, a motion to further amend the pleadings, filed just ten days earlier, was denied as untimely on motion of the putative father's new counsel. The latter's subsequent motion to withdraw his objection to the second of two paragraphs in the amendment, to which the petitioner then objected, was denied, the case remaining with an adjudicatory date of 3/13/96. Because the matter was not concluded at that time, a continued date of 10/24/96 was set for this purpose — fourteen months after the initial filing of this petition. At that time, upon conclusion of the petitioner's case, the father elected to consent to the termination of his parental rights although, in view of the admission that he had never acknowledged paternity or been adjudicated to be the father of Gabriel K., it is uncertain as to what rights he had consented to terminate. His consent was accepted, however, as having been given voluntarily and knowingly with the advice of counsel, and decision reserved as to disposition until judgement could be rendered in the mother's case.
Facts
Evidence offered at the evidentiary hearing, interpreted in the light of the prior court record involving this child, supports the finding of the following facts: CT Page 8920
Gabriel K., born 9/2/93, was the seventh child born out of wedlock to her then 35 year old mother. None of these children was in the custody of the mother for any of the nearly two year period preceding the adjudicatory date. Gabriel was referred to DCF at birth since her mother had had no prenatal care and admitted using crack cocaine throughout her pregnancy. Although Gabriel tested positive for cocaine at birth, she was not removed from her mother's custody at the time since she appeared to be at no immediate risk to her physical welfare. When she was six months old, however, DCF filed a petition alleging that she and the two of her six half-siblings who still resided with their mother to be neglected by reason of the mother's continuing drug and budgeting problems that led to chronic shortages of food and other necessities. A month after these petitions were filed, DCF secured an Order of Temporary Custody (OTC) on Gabriel upon reports that she had missed six clinic pediatric appointments in five months and had registered a decline in both height and weight percentiles apparently stemming from the mother's admitted practicing of watering down her formula. During the first six days of her placement, she gained two pounds. (Petitioner's Exh. A., p. 3.)
Shortly after her first birthday, on 9/21/94, Gabriel was committed to DCF as an uncared for child following a hearing, a month earlier, in which the mother admitted that she could not meet the child's special needs and the putative father acknowledged that he had no home to offer the child. The child was placed, together with her two half-siblings, in the home of the siblings' paternal aunt, Jean M., no blood relative of Gabriel. From the outset of her placement there, Jean's adult daughter, Cathy D., shared child care responsibility for all three children. Because Linda failed to appear on the date set for disposition, the court was unable to spell out on the record expectations for reunification, but the assigned social worker made it clear throughout her involvement with the case that reunification would have to begin with mother entering and completing a drug treatment program in addition to keeping in regular contact with the child. (Testimony of Social Worker Schmidt.) These requirements were further set out in the treatment plan dated 4/3/95 which was sent to both parents.
During the first two months of Gabriel's commitment, Linda was free to make her own arrangements to visit Jean, who lived in close proximity. Then Jean and her family moved across town, CT Page 8921 although still accessible by public transportation. Linda stopped visiting in Thanksgiving of 1994 for more than six months. She then appeared, unannounced, on Mother's Day of 1995, and as a result of her behavior on that occasion, Jean asked that visits thereafter be arranged by DCF. The following month, Linda called to report she had completed a drug program and wanted to work toward reunification. A schedule was worked out which provided weekly visits at a predetermined date and time at the foster home. She did not visit at all for the first month of the schedule; thereafter she visited a few times but never at the appointed times. Between the date she was served with the instant petition and the adjudicatory date six months later she did not visit at all. On Gabriel's birthday on 9/29/95 there was a chance encounter on the street between mother and daughter. She told Gabriel she would visit later in the day and bring a birthday gift, but she never appeared. Since that time she has not called foster parent or agency, has not inquired about the child's welfare, and did not attend any of the semi-annual administrative reviews of the treatment plan.
Since addressing her drug problem was the principal key to reunification, the social worker recommended a number of appropriate programs, none of which Linda completed. She was discharged from Project Courage for continuing to test positive for drug use in urine tests after three months in the program. She was taken to Gaylord hospital for inpatient treatment when she told the social worker she wanted help, but then refused to go for a required second appointment prior to admission. In June of 1995 she told the social worker she had gone to Liberation house the preceding February, but continued to abuse cocaine. She informed the social worker that she planned to enroll in yet another program with the help of a minister with whom she was then living.
During the pendency of this proceeding, in May of 1996, Jean M. died, but her daughter, Cathy, now 21 years old, was licensed to continue being Gabriel's foster parent so that her placement in that home, with her two half-siblings whose guardianship had been transferred from Jean to Cathy upon the death of the former, could remain undisturbed.
On her own behalf, Linda called only a volunteer worker at the Victory Outreach Program, a church-based residential drug treatment program lasting between nine and twelve months which Linda entered in November of 1995 and from which she expected to CT Page 8922 graduate in August of 1996. During the first six months after graduation, she will continue to live in Victory House on "re-entry" status. The witness, an ex-addict without formal licensure or special training as a drug counselor, testified that their program, from which Linda would be their first graduate, conducted no blood or urine testing for drugs on residents. She testified that Linda could have requested that Gabriel visit her at Victory House, and could have obtained permission to visit her daughter when accompanied by a "trusty". She did get such permission to attend her grandmother's funeral, but neither asked permission to visit Gabriel nor to have Gabriel visit her. She did not testify in her own behalf.
Adjudication — on facts as of 3/13/96
As to the putative father: It is questionable if a man who has been named, and has acted as, the child's father but who has never acknowledged paternity or otherwise exposed himself to being charged with the responsibility for her welfare as well as claiming the privileges of parenthood, should be regarded as having any paternal rights other than the right to claim paternity. Whatever rights Anthony G. may have, however, he has voluntarily relinquished on a written consent form executed and later confirmed in the presence of his attorney. It is, therefore, found that his consent is a valid ground for terminating his parental rights and all of the other nonconsensual grounds pleaded may be dismissed without finding or prejudice.
As to the mother, the state has established two of the four nonconsensual grounds set forth in Sec 17a-112(b) (Conn. Gen. Stat. Rev. 1995) for terminating her parental rights. The other two must be dismissed:
1) The petitioner offered no evidence that Gabriel has been denied any proper care, guidance or control necessary for her physical, educational, moral or emotional well-being since being placed in foster care at the age of seven months. Had there been such a denial during the nearly two years preceding the adjudicatory date, it would have been the legal responsibility of DCF, not of Linda who lost custody in April of 1994 and guardianship five months later when Gabriel was first committed to the state.
2) There was no evidence that Gabriel is unaware that Linda is CT Page 8923 her mother or that contact with her has a wholly detrimental effect upon her. As long as these circumstances exist, the judicial gloss placed upon the "no ongoing parent-child relationship" ground in In Re Jessica M., 217 Conn. 459 (1991) precludes its applicability, particularly when state intervention separates parent and child in the first place. In Re Valerie D.,234 Conn. 492 (1992); In Re Kelly S., 29 Conn. App. 600 (1992).
The fourth and fifth grounds checked on the termination petition are therefore dismissed.
The petitioner has, however, sustained its burden of proving by the required clear and convincing proof that the other two grounds pleaded for terminating Linda's parental rights exist:
1) While common-law abandonment could not be found where there is as much contact as Linda maintained with Gabriel and her caretakers for the nearly two years that preceded the adjudicatory date, the statutory standard is far less stringent. It is sufficient if there is clear and convincing proof that the parent has failed to maintain a reasonable degree of interest,concern or responsibility as to the child's welfare. There may have been frequent, casual contacts when Linda lived in close proximity to the home where her three children lived with Jean and Cathy, but from the end of 1994 when they moved a bus ride away, visiting became rare if not nonexistent. When a weekly visitation schedule was established at Linda's request in June of 1995, she did not adhere to it, even minimally. When she entered Victory House in November of 1995, she asked neither for permission for Gabriel to visit her there, nor for a "trusty" to accompany her on a visit to Gabriel, both of which would have been granted, according to her own witness. She did not observe Gabriel's first or second birthdays or Christmas of 1994 or 1995. On a chance encounter, she promised to go to the foster home with a birthday gift on Gabriel's second birthday in 1995, but she never came. The total amount of "interest, concern or responsibility" displayed by Linda K. in the nearly two years between Gabriel's initial placement in April of 1994 and the adjudicatory date does not add up to a "reasonable degree" of such interest sufficient to rebut the state's overwhelming evidence of abandonment. It is, therefore, found that Linda has abandoned her daughter within the definition in the statute. Sec.17a-112, Conn. Gen. Stat., Rev. 1995.
2) The test of whether a parent has rehabilitated is not whether CT Page 8924 she has adhered to listed court expectations or departmental service agreements, but rather whether, on the adjudicatory date of a termination petition, she is sufficiently closer to being able to provide adequate caretaking for the child, compared to when the child was originally removed, to "encourage the belief that "within a reasonable time, considering the age and needs ofthe child, such parent could assume a responsible position in the life of the child." The legislative history of this provision is significant. Where originally the court had to find no degree of interest, the legislature modified that to reasonable degree. February 1965 P.A. 488, Sec. 9. When that language was interpreted to mean that the parent had to be found predictably incapable indefinitely, the legislature modified the language to permit require the age and needs of the child to be considered.P.A. 74-164, Sec. 3, 20. March 13 of 1996 found Linda in her fourth month of a church-based drug treatment program that would require her continued residence in Victory House for a minimum of eleven months more. This program, which had no licensed or certified drug counselors and did no urine or other testing for continued drug use, had no local track record since Linda was scheduled to be its first "graduate" five months after the adjudicatory date. While reported to be in full compliance with the program's requirements — presumably drug-free — she did not exercise even minimally her privilege to maintain contact with her daughter, either through visits Gabriel could have paid to Victory House or accompanied visits she could have requested to visit Gabriel outside the residence. The facts that Gabriel had been removed from her care at the age of seven months and was two and a half years old on the adjudicatory date, and that she was firmly bonded to the two half-siblings with whom she had lived all her life and to Cathy, her "big sister" from whom she had received excellent care (testimony of Nurse Practitioner Hassam; state's Exh. C), provide both clear and convincing proof that while Linda may have begun, at last, the long road to rehabilitation from the drug addiction that had cost her custody of all seven of her children, by March of 1996 she had not yet reached "such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of . . . [Gabriel, she] could assume a responsible position in the life of the child." The state has thus provided clear and convincing proof of a second ground for terminating Linda's parental rights: her failure to rehabilitate.
Disposition — on facts as of 7/23/96
CT Page 8925
Between the adjudicatory date of 3/13/96 and the final hearing date with regard to the mother's parental rights on 7/23/96, little had changed. She remained, apparently in good standing, in the Victory Outreach residential drug treatment program with seven more months of being in residence there, six of which would be on a "re-entry" status, but still requiring her to live in Victory House. She had never demonstrated her ability to remain drug-free when living on her own, particularly when charged with the responsibility of caring for children. Until she can demonstrate that she can maintain sobriety without the support of a residential treatment program for a sustained period of time, there is nothing to provide confidence that she will be able to do so sufficiently to meet all of Gabriel's physical, psychological, educational and emotional needs. Cathy, on the other hand, has demonstrated her ability to do so for the past two and two-thirds years. Cathy will permit Gabriel to continue visiting with her mother when visiting her other two children currently in Cathy's care, in whom she retains parental rights. Gabriel, by being adopted by Cathy, will lose nothing except the uncertainty of where is "home". It is therefore found, by clear and convincing proof, that termination of Linda's parental rights is in Gabriel's best interests.
It is further found that DCF made reasonable efforts to reunite Gabriel with her mother by permitting virtually unlimited visitation, by recommending and urging Linda to enter and complete drug treatment, and by delaying the filing of this termination action which could have been initiated months earlier.
Before the court may order termination, however, it must consider the seven factors set forth in subsection (d) of Sec.17a-112:
1. DCF offered Linda the services that she had to avail herself of before consideration could be given to returning her child: Referral to drug treatment programs. Until two months after being served with this termination petition, she had never entered and completed such a program. On the dispositional date, she was still in a residential treatment program with months to go before being able to create a home for herself and Gabriel. Visitation was never denied and a schedule of weekly visits set up the only time Linda requested it.
2. As found above, DCF made reasonable efforts to reunite this CT Page 8926 family for a period beyond the 12 months required by Sec.17a-112.
3. No court orders or expectations were ever articulated for Linda since she failed to appear in court when Gabriel was committed, but what she had to do was clearly delineated by the social worker: Enter and complete drug treatment. Visit regularly. Establish a safe home to which a child could be taken. Linda was unable to fulfill any of these.
4. Gabriel, not surprisingly, is firmly attached to Cathy D. with whom she has been living and from whom she has received excellent care for the last 27 of her 34 months of life. She does not react negatively to visits from her biological mother, but her "home" is Cathy's home.
5. At the age of not quite three, Gabriel should not be asked to wait any longer than the 27 months she has already waited to be assured of permanency in this home when any further delay would be for an outcome that, as of the dispositional date, remains highly uncertain.
6. Linda did not even begin to make an effort to address the issue that caused her separation from Gabriel and her other six children until two months after being served with this petition. Assuming that the program is a valid drug treatment program, and that she will successfully complete it by February of 1998 (her earliest release from the residential requirement, according to her own witness), whether or not she will be able to sustain sobriety when living on her own only time will tell, and Gabriel cannot afford to wait any longer. Perhaps a crystal ball would reveal that Linda can accomplish this daunting task and will be able to make a home for her children in another year or longer. This is not the "foreseeable" future as far as Gabriel is concerned. Linda has other children whose custody she could seek returned to her, but for this child the "foreseeable future" is today.
7. Nothing prevented Linda from maintaining a meaningful relationship with Gabriel except her drug addiction and the resulting infrequency of contact for a period of more than a year in the life of a not-yet-three-year-old. Neither unreasonable acts of anyone or her economic circumstances were offered as the reason for the attenuation of such relationship. CT Page 8927
Judgement
Having considered the foregoing factors, and finding not only two grounds for terminating Linda's parental rights without her consent, and those of Anthony by his consent, but also that it is in Gabriel's best interests to be adopted by Cathy D. without delay, it is hereby ordered that the parental rights of Linda K. and Anthony G. in and to the child Gabriel K. be, and hereby are,terminated. And it is further ordered that the Commissioner of DCF be appointed statutory parent in order to secure a permanent home through adoption without delay and that such Commissioner file with this court on February 4, 1998, a written report as to the progress toward such permanency. If adoption has not been finalized by one year from the date of this judgment, the Commissioner is further ordered to file a Motion for Review of Terminated Child to be heard no later than fifteen months following the date of this judgment.
Entered at Bridgeport on this 4th day of November, 1996
Frederica S. Brenneman, Judge.