ARTICULATION OF DECISION
By direction of the Appellate Court the trial court articulates its decision as follows. Nazareth was born on September 25, 1998 and was removed from the natural parents four 7 days later by virtue of a ninety-six hour hold issued by the petitioner Commissioner of 7 Department of Children and Families ("DCF") on September 29, 1998. The infant child was 7 breast-feeding at the time of removal by DCF, and continued to breast feed during maternal visitation with the child during the time this court heard the matter and issued its decision on October 26, 1998.
After obtaining a ninety-six hour hold, the petitioner thereafter sought an Order of Temporary Custody and filed a petition alleging that the child is neglected in that the child CT Page 13190would be denied care and attention, physically, educationally, emotionally or morally and the child would be permitted to live under conditions, circumstances or associations injurious to the child's well-being.[2] Additionally, although absolutely no evidence was offered to establish the ground, the petitioner claimed that the child was uncared for in that the child had specialized needs which could not be met in the home.
Some background is necessary for a resolution of the issues relating to Nazareth. There are two other cases regarding this family which began long before Nazareth was born. On February 4, 1997, nearly two years ago, DCF filed petitions to remove Nazareth's older half-sister Alexandra, age eight, and older sister Cheyenne, born December 18, 1996. In the matter of his half-sister's case DCF also alleged that she was neglected by her parents. With respect to his sister Cheyenne, DCF brought a coterminous petition alleging abuse and neglect and acts of omission or commission regarding unexplained serious life-threatening injuries. DCF sought to terminate the parental rights of the respondents Jeanne A. and Robert A., the biological parents of Cheyenne.
The two cases were consolidated and commenced trial before the court on July 13, 1998. The neglect case and the termination of parental rights case were tried over nine days between July and October 8, 1998. The court heard from various witnesses including social workers, pediatricians, psychiatrists, a psychologist, a police officer, neighbors and relatives. On October 21, 1998, the petitioner and the respondents and all counsel in the cases of Alexandra and Cheyenne and the counsel and respondents in the matter of Nazareth agreed to consolidate Nazareth's case with the two cases earlier pending and that the evidence heard regarding Cheyenne and Alexandra could be considered to resolve all three cases. Thereafter, the court heard three more days of testimony, much of which related to the Nazareth case only. On the thirteenth day of testimony, the court entered judgment from the bench.
All three cases revolve around the serious, life-threatening injuries to the middle child Cheyenne. Joseph Schick, the principal DCF social worker testified that the neglect petition for the oldest child Alexandra was brought because of the injuries to Cheyenne. George Doyle, a regional DCF representative testified that the neglect petition with respect to Nazareth was brought principally because of the history of injuries to CT Page 13191 Cheyenne. No evidence of actual abuse or neglect was offered as to either Alexandra or as to the infant, Nazareth.
Cheyenne was approximately six weeks old on February 4, 1997 when she was brought to her pediatrician and subsequently to the hospital by her mother. The testimony of the pediatrician, the emergency room physician and Betty Spivac, an expert in pediatrics with a specialty in child abuse, all established to the court's satisfaction that Cheyenne had suffered at least seventeen rib fractures in various states of healing. The fractures were located in the posterior of the rib cage and, that mechanically, this type of injury is caused by severe sustained compression usually occurring during a shaking episode. This diagnosis is considered highly suggestive of child abuse. The child had no reported trauma of the magnitude of a car accident which might cause this type of injury. Osteogenesis imperfecta, brittle bone disease, was ruled out as a source of these injuries. The explanations of the parents, that the child rolled off a couch, and other subsequently offered reasons for the injuries were considered by the medical providers and by the court to be wholly inadequate.
After several months of reflection, advice and reconsideration, the parents postulated that the injuries to Cheyenne occurred at times that were coincidental to times that the paternal grandmother was caring for the child. While this raised the specter of a person other than the parents as the perpetrator of the injuries, the court was satisfied by clear and convincing evidence that Cheyenne had been denied by reason of an act or acts of commission or omission of the parents, the care guidance or control necessary for her physical well-being in that Cheyenne had sustained serious, life-threatening injuries that have been inadequately explained. General Statutes § 17a-112(c)(3)(C)
The court thereafter entered the following orders:
1. Notice of this proceeding had been provided in accordance with the Practice Book and this court had jurisdiction.
2. No action was pending in any other court affecting custody of the two oldest children. An action is pending in the U.S. District Court for Connecticut with respect to the youngest child, Nazareth. CT Page 13192
The Court, having read the verified petitions, the social studies, the psychological and psychiatric evaluations and heard the testimony of numerous witnesses over twelve days of testimony made the following findings:
By a fair preponderance of the evidence, as of the date of the petition, the court found no evidence had been presented that Alexandra P. had been neglected and the petition as to this child was dismissed.
With respect to the child, Cheyenne A. the court found that this child had been neglected in that the child had been abused and had physical injuries inflicted by other than accidental means.
With respect to the child, Nazareth A., the court found that this child had been neglected in that the child was permitted to live under circumstances and conditions injurious to his well being. The child was appropriately removed from his home by the Department of Children and Families (" DCF"), in order to protect the child and to permit the court to review the facts and the sociological history, and to set safeguards to ensure the health and safety of the child.
With respect to the statutory grounds for termination of parental rights of the child, Cheyenne, the court found by clear and convincing evidence:
1. DCF had made reasonable efforts to reunify the child with the parents.
2. The child, Cheyenne, had been denied by reason of an act or acts of commission or omission of the parents, the care guidance or control necessary for her physical well-being in that Cheyenne had sustained serious, life-threatening injuries that have been inadequately explained. General Statutes § 17a-112(c)(3)(C)
The court found that this ground had existed over an extended period of time which was greater than one year.[3]
D. The court made the following factual findings required by § 17a-112(e):
1) Appropriate and timely services were provided by the Department of Children and Families including anger management, CT Page 13193 parenting skills training, individual counseling, and visitation coordination.
2) The court found by clear and convincing evidence that the Department of Children and Families had made reasonable efforts to reunify the parents and child given the situation and circumstances as far as possible. The action of DCF to institute termination proceedings was consistent with the federal law designed to eliminate foster care drift and to protect the health and safety of the child.
3) The Department, with the approval of the Court, set reasonable and realistic expectations in order to reunify the family. With respect to the child, Cheyenne, the parents were not always cooperative with the agency. The parents did not complete the expectations regarding Cheyenne in a timely fashion.
4) The child has strong emotional ties with the foster family that has provided the physical, emotional and educational support this child needs. Cheyenne views her foster parents as her psychological parents. The child has a visiting relationship with the biological parents.
5) Finding regarding the age of the child. This child, Cheyenne, was born December 18, 1996 and she is nearly two years of age. The child requires stability of placement and continuity of care.
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions, etc. The parents had not made realistic and sustained efforts from the beginning of Cheyenne's placement to vigorously conform their conduct to acceptable parental standards. They did not enter counseling in a timely manner. Giving them additional time would not likely bring their performance, as parents, within acceptable standards sufficient to make it in the best interests of Cheyenne to be reunited. In re Luis C. 210 Conn. 157 (1989); In re JuvenileAppeal 183 Conn. 11, 15 (1981).
7) Finding regarding the prevention of a parent from having a meaningful relationship etc. The Department arranged visitation. No unreasonable conduct was noted.
Based upon the foregoing findings, the court concluded that it was in the best interests of Cheyenne to terminate the parental rights of Jeanne A. and Robert A. It was accordingly, CT Page 13194 ordered that their parental rights to Cheyenne were terminated. The Commissioner of the Department of Children and Families was appointed the statutory parent. The neglect petition as to Alexandra P. was dismissed.
With respect to the child Nazareth, the court ordered Protective Supervision of this child for the period of one year subject to the following conditions.
The respondents Jeanne and Robert A. were ordered to:
1. Keep all appointments set by or with DCF social worker's. Home visits by DCF, announced or unannounced, may occur at any time of the day within reason, and with the child's court appointed attorney and guardian ad litem.
2. Keep the child's whereabouts and their own whereabouts known to DCF, their attorney and the attorney for the child.
3. Participate in counseling and make progress toward the identified treatment goals. The counseling will include, but is not limited to anger management, impulse control, protection of children of tender age from physical harm, adequate parenting skills and substance free life style. Further treatment goals may be ascertained upon review of the psychological evaluation ordered herein.
4. Accept and cooperate with the following in home services and make progress toward the identified goals:
 (a) Intensive family reunification and or preservation program;
(b) Parent aide;
 (c) Two weekly DCF R.N. or VNA visits and examination of the infant on a random announced or unannounced basis.
5. Submit to substance abuse assessment and follow recommendations regarding treatment. If indicated, treatment should include random drug testing. The time and method of testing shall be at the discretion of DCF.
6. Participate and fully cooperate with a psychological evaluation by the Yale Child Study Center, and follow the CT Page 13195 recommendations.
7. Sign releases authorizing DCF to communicate with service providers to monitor attendance, cooperation, and progress toward identified treatment goals.
8. Secure and maintain adequate housing and legal income.
9. No substance abuse.
10. Not to engage in criminal conduct.
11. Bring the child for medical examination by a pediatrician approved by DCF bi-weekly and notify DCF of the dates and place of such examination.
12. Notify DCF in a timely fashion of any medical procedure done on the child.
13. Notify DCF of all prospective care givers of the child, allow DCF to interview and approve said caretakers in advance. The process of approval may include background and police checks if DCF deems such check necessary.
14. Nazareth shall not be left unattended or in the care of the child's half sibling Alexandra.
15. DCF shall be allowed to speak with such respondent and/or any other family member in the presence of the guardian ad litem.
16. The respondents shall not remove the child from the State of Connecticut during the duration of this order. The child may temporarily travel out of state only if the parents obtain permission to do so from DCF or this court in advance.
17. Any violation of this order or non-compliance with its terms may be a ground for the child's removal by an order of temporary custody and the modification of the disposition and the child's commitment to the Petitioner.
Thereafter the court ordered DCF to provide certain services to the family and retained jurisdiction to monitor compliance with the orders. In addition to the Conditions of Protective Supervision set forth above, the court added the following condition: that the respondents shall not move their residence or CT Page 13196 relocate this child outside of the State of Connecticut during the terms of this protective supervision.
Thereafter the court addressed the respondents as follows:
"I would like to take this opportunity to speak to the respondent/parents directly before you leave the court. First, living with these conditions of protective supervision is going to be very difficult for you. The orders of the Protective Supervision are very invasive. No person or parent would want their home and personal space to be invaded to the extent your home will be monitored by DCF and others during the next year. It will be extremely taxing on you. To have DCF making two unannounced visits and the nurse making two unannounced visits per week, is extremely invasive. You must consider however, that the court is very concerned with the safety of Nazareth. The court is also concerned that this child not lose the bond of the mother and child and me father-child relationship. But you must do the counseling and cooperate with these court orders.
You should understand that the social workers and nurses who will be visiting you may find this to be an unpleasant task as well. I want you to be pleasant to them, they are just doing their job. Your attitude will make their job, and your life, much more pleasant and less burdensome if you allow their visits with a spirit of cooperation and mutual respect.
Please understand, that if the court receives reports that are adverse, that you are being hostile or non-cooperative, the court can order DCF to remove the child.
 You should also know that there is a new statute that reads as follows: "The parent of a child under the age of seven who is neglected or uncared for, has failed, is unable or unwilling, to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child and such parent's parental rights of another child were previously terminated pursuant to a DCF petition. General Statutes § 17a-112(c)(3)(E).
This means that DCF can move to terminate your parental rights if the court finds you are not observing the conditions of protective supervision. It is in your best interests, and CT Page 13197 Nazareth's best interest to cooperate with DCF and to follow through with these court orders.
As you know, I am taking a risk here. I have faith that this child will come to no harm at the hands of his parents. Good luck to you and to Nazareth."
 With Respect to the Finding of Neglect
The sole basis for a finding of neglect in this case was a risk assessment that the child would be subject to abuse or neglect without continued supervision and proper conditions being set by the court. The risk assessment was predicated on the finding made relative to the child, Cheyenne, namely that she had sustained seventeen fractures to the ribs incurred over several different dates, without adequate explanation. This assessment is not mere speculation as to what acts might befall the child. Inre Kelly S. 29 Conn. App. 600.614 (1992). It is an evaluation based upon known facts, common sense, judicial experience and concern for the care and safety of other children similarly situated. As Judge Frederica Brenneman aptly stated:"the more enlightened majority rule appears to be that a parent does not have the privilege of inflicting brutal treatment upon each of his children in succession before they may individually obtain the protection of the state. The issue in prospective neglect or abuse cases is whether future behavior, which will adversely affect the child, can be reasonably and certainly predicated." Inre Jessica R. 1990 WL 270415 (Conn.Super. June, 1990, Brenneman, J.)
The conditions of protective supervision imposed by the court on Nazareth's parents were the most stringent ever ordered by this court. The purpose of the conditions is clear: if these parents had injured their other child, Cheyenne, the court was intent upon monitoring the family to ensure that Nazareth would not come to any harm. Implicit in this order was the court's conclusion that the infant/maternal bond should be maintained and that it was in the child's best interest to be reunited with his parents. This assessment was made after the DCF social worker presently involved in this case and a DCF social worker trainee, both testified to the present cooperation of the parents with DCF and its directives and to the very positive interaction and nurturing of the mother with the child during visitation.
 With Respect to the Denial of the Motion for Stay
CT Page 13198
Issues presented in neglect cases and termination cases are as difficult for judges as in any other area of the law. The decision to remove a child from a home is an extremely delicate decision-making process. In the first instance, it involves the application of very specific, statutorily driven, legal principles, balancing fundamental, constitutionally protected rights of family integrity with children's right to be free of abuse and neglect, as well as, making sociological risk assessment decisions. It can only be described as a complex balancing act. If the child is removed inappropriately, the devastation to a child torn from its parents may result in long term psychological damage. If the child is not removed and is subsequently endangered, even greater damage may result. Social and political pressures from the community urge child protection workers and the courts to act quickly to remove children from virtually any perceived danger. Others in the community passionately argue against any coercive governmental intervention in the family for fear that child protection workers and the courts will separate families too readily and reunify too slowly.
Similar balancing considerations are involved in analyzing and authorizing the reunification of that child into a family setting that may have been an abusive or neglectful environment. This court has balanced these conflicting considerations, the likely outcome of the appeal, the possibility of irreparable harm to the child and to the parent, and the effect of delay in implementation of the order upon other parties as well as the public interest. (Paraphrasing from Griffin Hospital v.Commission on Hospital Healthcare, 196 Conn. 451, 458-59 (1985). While there is some risk attached to the return of the child, Nazareth, with the imposition of the safeguards ordered by the court as conditions of protective supervision, weighing the risk of psychological damage which may be suffered by a nursing infant being removed from his mother against the likelihood of harm to the child with all of the court imposed safeguards, this court is satisfied that the child should be immediately returned to his parents. Accordingly, the court denied the motion for stay to permit the speedy return of the infant to his mother's breast.
By the court,
Foley, J.