Memorandum of Decision
On April 17, 1998, the Department of Children and Families (DCF) filed petitions to terminate the parental rights of Beth S. and Richard P. to their sons David P., Joshua P., and James P. On June 4, 1998, Beth S. consented to termination and judgment entered terminating her rights to her three sons. A consolidated trial of the petitions to terminate the parental rights of Richard P. took place on November 9, 1998. The trial established that Richard P. is a seventy year old pedophile who was convicted of sexually abusing his step-daughter in 1993, who also abused David and Joshua, and who will not likely be released from prison until 2004 at the earliest. Based on these facts, and for the additional reasons stated below, the Court grants the termination petitions.[2]
FACTS
The Court finds the following facts and credits the following evidence. The father, Richard P., was born in 1928, dropped out of school after the fourth grade, and was convicted of ten criminal offenses between 1955 and 1972. The father met the mother, Beth S., in 1985. From this relationship, which never culminated in marriage, David was born in 1988, Joshua in 1989, and James in 1991. During much of this same time period, the father had a relationship with another woman, with whom he also had a child.
In 1993, the father was arrested on three counts of first degree sexual assault and three counts of risk of injury to a minor. One of the victims was Leah S., who was the minor daughter of Beth S. from a previous marriage. In 1995, the father was convicted on all six counts and sentenced to fifteen years in CT Page 14744 prison. The father's estimated release date is February, 2004. His maximum release date, which apparently applies if he does not get good time credit, is January, 2006.
The father is an admitted pedophile. He claims that he would never harm his own children and, when confronted with the fact that he abused Leah, he has stated that he did not consider Leah to be his own child. According to Dr. Richard Sadler, a psychiatrist who testified at trial, the father's makeup strongly suggests that he has a sociopathic personality disorder. The father has not participated in available sex offender treatment programs in prison. He has not contacted the DCF social workers involved in the case to find out about the welfare of his children, and he has made only sporadic and incomplete attempts to correspond or obtain visitation with them.
DCF became involved at the time of the 1993 arrests by obtaining an order of temporary custody for Leah and the three boys. At about that time, David disclosed to DCF that his father had sexually abused him and his younger brother Joshua.[3] The three boys were adjudicated neglected and placed under protective supervision until April, 1995. The court ultimately terminated parental rights to Leah and she was adopted.
Because of persistent difficulties that the mother and the boys were having, David and Joshua went to various institutions for treatment in 1996 and ultimately were placed voluntarily in a residential program at the Wheeler Clinic. In July, 1997, the mother removed the two boys against medical advice and, with James, who had been at home, left for the Midwest to meet some people she had talked to on a psychic telephone hot line. In Missouri, James was sexually abused.
On July 30, 1997, upon return of the mother and the boys, DCF filed its second neglect petition and obtained a second order of temporary custody. James was then admitted to a Wheeler Clinic group home and David and Joshua were returned there. On November 24, 1997, the mother pleaded nolo contendere to the neglect petition. On March 16, 1998, the children were adjudicated uncared for and homeless in relation to the father. As stated, on June 4, 1998, the mother consented to termination of her parental rights.
The boys remain in placement at the Wheeler Clinic. Not surprisingly given their horrific upbringing, they have a battery CT Page 14745 of problems including post traumatic stress disorder, attention deficit hyperactivity disorder, and dysthymia. James, particularly, exhibits very disturbed functioning suggestive of being psychotic.
None of the boys has any positive memories of their father. To the extent they mention him it is in fear. David, the oldest, has stated that he hoped his father would get the electric chair. The therapists in this case have unanimously recommended against visitation with the father and DCF has followed their advice. Despite the problems that the boys have, the therapists at the Wheeler Clinic believe that the boys are adoptable. Even if they are not adopted, termination of the father's parental rights is important to them clinically because it will give them a sense of safety.
ADJUDICATION A. Reunification
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." Conn. Gen. Stat. § 17a-112(c)(1).[4] In this case, DCF has made no efforts to reunify the father with the children. The Court finds, under the exception clause in § 17a-112(c)(1), that the father is unable to benefit from reunification efforts because he is an admitted pedophile who will not be released from prison until at least 2004, when he will be 76, who has not obtained sex offender treatment in prison, and who has not expressed any continuing concern for his children. Indeed, in the Court's view, the notion of attempting to reunify the father with the boys that he has harmed is truly frightening.
B. Statutory Grounds
To prevail in a nonconsensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See Inre Michael B., 49 Conn. App. 510, 512 (1998); Conn. Gen. Stat. § 17a-112(c)(3). General Statutes § 17a-112(c)(3) requires that, with one exception not pertinent here, these CT Page 14746 grounds must have existed for at least one year unless the Court waives the one year requirement based on the standards set forth in § 17a-112(d).[5] In this adjudicatory phase, the Court is limited to events preceding the filing of the petition or the latest amendment. See Practice Book § 33-3(a). The relevant date in this case is thus April 17, 1998.[6]
DCF in this case has alleged the grounds of failure to rehabilitate, acts of commission or omission, and lack of an ongoing relationship. DCF alleges that these grounds have existed for more than one year, except for failure to rehabilitate, for which it seeks a waiver of the one year requirement. See note 6 supra. The Court finds that DCF has proven its allegations by clear and convincing evidence except for the allegation of acts of commission or omission concerning James.
1. Failure to Rehabilitate
A statutory ground for termination arises when "the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112(c)(3)(C). The statute requires the Court to analyze the parents' rehabilitative status "as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable `within a reasonable time."' In re Luis C.,210 Conn. 157, 167 (1989). The statute, however, does not require parents "to be able to assume full responsibility for a child, without the use of available support programs." In re Jessica M.,49 Conn. App. 229, 240 (1998) (internal citation omitted).
No dispute exists that the Court has previously found the children to have been "uncared for," thus satisfying a statutory prerequisite. The rest of the statute requires the Court to find whether the facts "encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112(c)(3)(C). Because of the requirement that the Court predict what will happen within a "reasonable time" after the filing of the termination petition, it is sensible to conclude that the Court can consider not only CT Page 14747 the parents' conduct before the filing of the termination petition, but also the conduct occurring after it.
The Court would be inclined to find that a failure to rehabilitate exists based on the simple fact that the father will not be released from prison for at least another six years. Six years is more than a "reasonable time" for these children to wait for a father to assume a responsible position in their lives. Of course, there is much more in this case. The father is an admitted pedophile who has molested two of the boys and their half sister, who has not obtained sex offender treatment, who has not demonstrated any continuing concern for these boys, and who will be seventy-six years old at the time of release. These facts establish that the father would have to make wholesale changes in his life to rehabilitate himself and that he has done virtually nothing. On this record, DCF has proven the father's failure to rehabilitate.
2. Acts of Commission or Omission
General Statutes § 17a-112(b)(3) authorizes the termination of parental rights when the child "has been denied, by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for his physical, educational, moral or emotional well-being." This provision authorizes termination when "specific acts of parental commission or omission have caused serious physical or emotional injury to the child." See In re Felicia D., 35 Conn. App. 490, 502, cert. denied, 231 Conn. 931 (1994). The ground does not permit termination "based on speculation as to what acts may befall a child." In re Kelly S., 29 Conn. App. 600, 614 (1992).
It is obvious that the father's sexual abuse of David and Joshua constitutes injurious acts of commission under this subsection. DCF argues that the father's molestation of Leah while the three boys were in the same household also represents an injurious act to them. The Court, however, does not find the evidence clear that the father's molestation of Leah took place while the boys were in the same household. Further, it is not clear that James was even born when the father abused Leah. In James's case, there are no other specific acts of paternal commission or omission alleged to have caused his emotional injuries. In fact, James was tragically molested by someone other than his father in Missouri in 1997. The evidence of paternal acts of commission or omission is thus clear and convincing in CT Page 14748 the case of David and Joshua but not clear and convincing in the case of James.
3. No Ongoing Relationship
The third statutory ground alleged in this case is that there is "no ongoing parent-child relationship, which means the relationship that develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." Conn. Gen. Stat. § 17a-112(c)(3)(D). This ground encompasses a situation in which "regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitely lost that relationship, so that despite its former existence it has now been completely displaced."In re Juvenile Appeal(Anonymous), 181 Conn. 638, 645 (1980) (internal citation omitted). "In either case the ultimate question is whether the child has no present memories or feelings for the natural parent" Id. at 646.
The evidence is clear and convincing that the boys have no positive feelings for their father. Indeed, they suffer from post traumatic stress disorder and emotionally live in fear of their father. The Court accordingly finds that DCF has proven all allegations of lack of an ongoing relationship.
4. One Year Requirement
The father argues that the one year requirement was not met on the failure to rehabilitate ground because DCF filed the termination petition only one month after the adjudication of neglect which, according to the statute, allegedly marks the starting point for the one year period. The Appellate Court, however, specifically rejected this argument in In re Felicia D.,35 Conn. at 497-98, and held, in the failure to rehabilitate context, that "the statutory year does not require a fixed starting date." Id. at 498. In the present case, the grounds for termination existed for as much as five years (beginning with the events of 1993) before the filing of termination petitions. The Court accordingly finds that the statutory grounds supporting termination meets the one year requirement.[7]
DISPOSITION
CT Page 14749
In the dispositional phase of a termination case, the Court must consider whether the State has proven by clear and convincing evidence that "termination is in the best interest of the child." Conn. Gen. Stat. § 17a-112(c)(2). The Court can consider all events occurring through the close of the dispositional hearing. Practice Book § 33-5.
The best interests of the children clearly and convincingly require termination of the parental rights of Richard P. for all the reasons stated above and below. Termination may help these boys put some of their appalling upbringing behind them and give them the courage to face the future. Especially in the case of David, who will be eleven years old next March, termination now is essential to give the boys a realistic chance of being adopted.
In arriving at a decision, the Court must also consider and make written findings regarding seven factors set out in General Statutes § 17a-112(e). See In re Tabitha P.,39 Conn. App. 353, 362 (1995). A discussion of these factors follows.
1) The timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent.
Based on the foregoing discussion, the Court finds that DCF reasonably declined to provide services for the father, based primarily on the advice of therapists that reunification of the father was not in the best interests of the children.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980. Based on the foregoing discussion, the Court finds that DCF made no efforts to reunify the father and the children but that this approach was reasonable.
3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
There is no evidence of any court-imposed expectations with regard to the father. CT Page 14750
4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
As stated above, the children have no positive emotional ties to their father and, to some extent, have recurring fears of him. The boys are not in permanent placements and so there is no evidence that they have bonded with any alternative care givers.
5) The age of the child.
David will be eleven in March, 1999, Joshua is almost nine, and David is seven. These boys, and especially David, will soon be too old to stand a meaningful chance of being adopted. Therefore, in considering whether to terminate parental rights in this case, time is of the essence.
6) The efforts the parent has made to adjust his circumstances or conditions to make it in the best interests of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Based on the foregoing discussion, the Court finds that the father has made no meaningful efforts to adjust his circumstances or to establish contact with his children in hopes of permitting reunification.
7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent.
Although prison obviously limits the father's ability to maintain a meaningful relationship with his children, the father has not pursued available avenues of treatment or correspondence. As stated above, the father's difficulties CT Page 14751 are entirely of his own making.
CONCLUSION
Based upon the foregoing findings, the Court determines that it is in the best interest of David P., Joshua P., and James P. for a termination of parental rights to enter with respect to the father, Richard P. Accordingly, the Court hereby terminates all parental rights. The Court further orders that the Commissioner of DCF is appointed statutory parent for these children for the purpose of securing an adoptive family. The Commissioner shall file with this Court no later than 90 days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
It is so ordered.
Carl J. Schuman, Judge, Superior Court
[2] At the beginning of trial, the father announced that he was dissatisfied with his court-appointed lawyer, Attorney Raymond Rigat, because Mr. Rigat allegedly had failed to prepare adequately. The Court heard convincingly from Mr. Rigat that he was prepared for trial and that he could adequately represent his client. The Assistant Attorney General then represented, and there was no dispute, that Mr. Rigat was the petitioner's fourth court-appointed attorney and that, at the time of his appointment, Judge Foley had advised the father that, if he did not cooperate with Mr. Rigat, the Court would not appoint another lawyer for him and that he would have to represent himself. Indeed, the record confirms that the father has had four attorneys in the past year and that the third attorney withdrew because the father had sued him. When confronted by the Court with the option of continuing with Mr. Rigat or, alternatively, firing him and going pro se, the father elected to fire Mr. Rigat and thereby represent himself The father then stated that he believed he would be disruptive if he remained in the courtroom and asked to leave. The Court reminded the father that he had a right to be present in the courtroom and that, if he persisted in his desire to leave, he could at least observe and listen to the trial in a room designed specifically for this purpose adjacent to the courtroom. The father declined this option as well, at which point the Court excused the father from the courtroom, CT Page 14752 ordered him returned to the courthouse holding cell, and appointed Mr. Rigat as standby counsel. During every break in the trial, the Court had the sheriff and, during the lunch break, Mr. Rigat, ask the defendant whether he would like to return to the courtroom or sit in the observation room. In every case, the response from the father was that he would prefer to remain in the holding cell. On the basis of these facts, the Court finds that the father knowingly and voluntarily elected to represent himself and waived his right to be present in the courtroom. The Court also finds, after having heard the trial, that Mr. Rigat was well prepared for trial, that he very effectively served as standby counsel, and that, indeed, Mr. Rigat raised some thought-provoking issues in a case in which DCF had overwhelming evidence against the father.
[3] In 1997, David reiterated part of this claim to DCF, this time stating that his father had attempted to rape him. In a psychiatric evaluation in 1997, Joshua stated that David had been abused and suggested that he had been abused, also.
[4] The Court need not make such a finding, however, "if a court has determined at a hearing pursuant to subsection (b) of section 17a-110 [dealing with permanency planning for committed children] that such efforts are not appropriate." Id. DCF concedes that in this case no prior finding formally entered.
[5] Effective July 1, 1998, section 8 of Public Act No. 98-241 eliminates the one year requirement. DCF does not claim reliance on this amendment because of concerns that a substantive change in the law should not apply retroactively to a petitions, such as the petitions here, filed before the effective date of the new law.
[6] DCF orally moved to amend the petitions at trial to allege a waiver of the one year requirement for the failure to rehabilitate claims. The Court granted this amendment, but does not construe DCF's motion to amend to seek a change in the adjudicatory date of April 17, 1998. In any event, changing the adjudicatory date to November 9, 1998 would not alter the substance of this Court's decision.
[7] Moreover, the Court can waive the one year requirement if it finds "[f]rom the totality of the circumstances surrounding the child that such a waiver is necessary to promote the best interest of the child." Conn. Gen. Stat. § 17a-112(d)(1). DCF CT Page 14753 seeks such a waiver in this case. See note 6 supra. Based on the discussion that follows of the best interests of the child, the Court waives the one year requirement to the extent necessary to sustain this decision.